# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| MICHAEL HARRIS, | Case No. |
| JACOB BLAKE SR., | |
| BIANCA AUSTIN, | |
| CORTEZ RICE, | |
| NEMET ALRAWAJFEH, | Judge |
| JAVONNA BEASLEY, | |
| JAY BODEN, | |
| QUINTON BYRD, | |
| DEVANTE CLARK, | |
| DEVONNA CULVER, | COMPLAINT |
| JANAE FORT, | |
| MYKIA JOHNSON, | |
| AYOMIDE MANNS, | (JURY DEMAND) |
| DAMEAN MARTIN, | |
| CALEB MAYS, | |
| JORDAN MAYS, | |
| HARRISON MILLS, | |
| EVAN O'REILLY, | |
| HARSHITA RAY, | |
| NATALIA ROBANHODE-WYRD, | |
| BRANDON ROBINSON, | |
| JACK ROHRER, | |
| EMILY TERRY, AND | |
| BRANDON WRIGHT, | |

c/o Friedman, Gilbert + Gerhardstein
50 Public Square, Suite 1900
Cleveland, Ohio 44113

      **Plaintiffs,**

v.

THE CITY OF AKRON,
MAYOR DANIEL HORRIGAN,
CHIEF OF POLICE STEPHEN MYLETT;
DEPUTY CHIEF OF POLICE JESSE LEESER,
CAPTAIN MICHAEL YOHE,
CAPTAIN SCHWARTZ,
CAPTAIN C. BREWER,

CAPTAIN LAUGHLIN,
CAPTAIN RINN,
LT. MARKS,
LT. R. KUZNIK,
LT. MICHAEL MILES,
LT. GARRO,
LT. KAPPLER,
SGT. BLACK (#886),
SGT. OKOH,
SGT. RINN,
SGT. TIMOTHY SINSLEY,
SGT. N.J. MILSTEAD,
SGT. VINCENT TERSIGNI,
AKRON POLICE OFFICER BADGE #1918,
AKRON POLICE OFFICER BADGE #1521,
AKRON POLICE OFFICER BADGE #1247,
AKRON POLICE OFFICER BADGE #1419,
AKRON POLICE OFFICER BADGE #1128,
AKRON POLICE OFFICER BADGE #1197,
AKRON POLICE OFFICER BADGE #1310,
AKRON POLICE OFFICER BADGE #1231,
AKRON POLICE OFFICER K. BROWN (#1260),
AKRON POLICE OFFICER R. DANEY (#1267),
AKRON POLICE OFFICER A. BROWN (#1269),
AKRON POLICE OFFICER SMITH (#1292),
AKRON POLICE OFFICER SHOEMAKER (#1505),
AKRON POLICE OFFICER THOMPSON (#1518),
AKRON POLICE OFFICER DOMER (#1531),
AKRON POLICE OFFICER TAYLOR (#1532),
AKRON POLICE OFFICER L. DONOHEW (#1556),
AKRON POLICE OFFICER A. BROWN,
AKRON POLICE OFFICER BRIAN BOSS,
AKRON POLICE OFFICER MATTHEW AKERS,
AKRON POLICE OFFICER CRAWFORD,
DETECTIVE J. SMITH (#1336),
DETECTIVE ROBERT VANEK,
and

**JOHN DOE AKRON POLICE OFFICERS 1-50,**
c/o J. Christopher Reece
City of Akron Law Department
Ocasek Government Office Building
161 S. High St. Suite 202
Akron OH 44308

and

**AKRON UNIVERSITY POLICE OFFICER
KABELLAR (#18 / 55),
AKRON UNIVERSITY POLICE OFFICER
CHRISTINA ULLUM,** and
**AKRON UNIVERSITY POLICE MAJOR
GILLBRIDE,**
c/o University of Akron Office of the
General Counsel
Buchtel Hall, Rexford Suite 63
Akron, OH 44325

and

**SUMMIT COUNTY SHERRIFF'S DEPUTY
ANDREW BAILING (#0992),**
c/o Summit County Law Department
Ohio Building 8th Floor
175 South Main Street
Akron, OH 44308

**Defendants.**

---

Plaintiffs **Michael Harris, Jacob Blake Sr., Bianca Austin, Cortez Rice, Nemet**

**Alrawajfeh, Javonna Beasley, Jay Boden, Quinton Byrd, Devante Clark, Devonna Culver,**

**Janae Fort, Mykia Johnson, Ayomide Manns, Damean Martin, Caleb Mays, Jordan Mays,**

**Harrison Mills, Evan O'Reilly, Harshita Ray, Natalia Robanhode-Wyrd, Brandon**

**Robinson, Jack Rohrer, Emily Terry,** and **Brandon Wright,** through counsel, for their Complaint against Defendants allege as follows:

**INTRODUCTION**

1. This is a civil rights action against the City of Akron, its Mayor, its Police Department and Police Officers, and mutual aid law enforcement officers working at Akron's behest, who violated the constitutional rights of peaceful demonstrators protesting the 2022 Akron police shooting of young Jayland Walker.

2. On June 27, 2022, eight Akron Police Officers killed Jayland Walker, a 25-year-old unarmed Black man, shooting him more than 46 times. In the following days, community members in Akron and from around Ohio and the country took to Akron's public spaces to protest, chant, march, and call for change.

3. On Sunday, July 3, 2022, the people of Akron finally saw footage of the killing. That afternoon and evening community members gathered and exercised their right to peaceably assemble and petition their City and Police Department to redress the police culture that led to Jayland's death.

4. To silence these protesters' speech, the City of Akron and its Police Department devised, coordinated, and executed a policy of suppressing protests by issuing an unlawful curfew order and enforcing it through unlawful uses of force and mass arrests and prosecutions.

5. Defendant Mayor Daniel Horrigan issued an unpublished, eleventh-hour Emergency Order, which instituted a curfew beginning a mere thirteen minutes after the Order was first verbally announced. The unconstitutional Order and curfew stifled and chilled protestor speech and criminalized vast swaths of conduct, both expressive and non-expressive, without sufficient notice to those subjected to it.

6. Under the Emergency Order, police seized and arrested people downtown *en masse*—protesters and bystanders alike. They accomplished these arrests in part through physical violence, pepper spray, and tear gas. They brought their captives to a booking station and charged them with random combinations of misdemeanor disorderliness offenses, using non-particularized copy-and-paste Arrest Forms and Criminal Complaints. These documents were not only materially identical from arrestee-to-arrestee, they were also devoid of *any* factual allegations that could support probable cause. In almost all of these cases, and in every case concerning Plaintiffs here, all charges would later be dismissed or the defendants found not guilty by a judge or jury.

7. In the subsequent days, Officers continued to employ violence, chemical weapons, and baseless arrests and criminal charges to suppress and retaliate against protesters whose messages they disliked.

8. Plaintiffs in this lawsuit are peaceful protestors and bystanders who were arrested in Akron between July 3 and July 7, 2022, as part of the retaliatory and suppressive actions taken, authorized, and ratified by Defendants. Akron subjected Plaintiffs to a vague, overbroad, and otherwise unlawful curfew. Akron police beat, teargassed, pepper sprayed, or otherwise violently seized Plaintiffs in violation of their rights. Police then swept Plaintiffs into unlawful mass arrests and detentions. Finally, Akron brought and maintained sham charges against Plaintiffs and put them through nearly a year of criminal litigation until the charges were dismissed. All of this conduct was perpetuated as part of the City's policy and plan, and as part of the suppression and retaliation against First Amendment protected activities. Even as Plaintiffs here file this Complaint, Akron's

same policies and practices persist against still-ongoing protests surrounding Jayland's death.

9. This Court has jurisdiction pursuant to the Civil Rights Act of 1871, 42 U.S.C. §1983 et seq; the Judicial Code, 28 U.S.C. §§1331 and 1343(a); and the Constitution of the United States.

10. The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

11. Venue is proper in this District under 28 U.S.C. § 1391(b). Defendants and most Plaintiffs, reside, or, at the time the events took place, resided in this judicial district, and the events giving rise to Plaintiffs' claim also occurred in this judicial district.

## PARTIES

12. **Plaintiffs Michael Harris, Jacob Blake Sr., Bianca Austin, Cortez Rice, Nemet Alrawajfeh, Javonna Beasley, Jay Boden, Quinton Byrd, Devante Clark, Devonna Culver, Janae Fort, Mykia Johnson, Ayomide Manns, Damean Martin, Caleb Mays, Jordan Mays, Harrison Mills, Evan O'Reilly, Harshita Ray, Natalia Robanhode-Wyrd, Brandon Robinson, Jack Rohrer, Emily Terry,** and **Brandon Wright** are individuals who were peacefully protesting and/or peacefully standing by, during the July 3-7, 2022 protests against the killing of Jayland Walker, and who were subjected to unlawful uses of force, detention, arrest, prosecution, and First Amendment suppression and retaliation by Defendants.

13. **Defendant City of Akron** is an Ohio municipal corporation in Summit County where the events at issue in this Complaint occurred. Defendant City of Akron is a unit of local government organized under the laws of the State of Ohio residing in the Northern

District of Ohio acting under the color of law. The City is a "person" under 42 U.S.C. § 1983. The City operates the Akron Police Department. The City is the employer and principal of each of the police officers named as Defendants in this case including the John Doe Officers and was in control of the mutual aid officers working at its behest during the at-issue protests. The City is responsible for its own policies, practices, and customs and those of the Akron Police Department.

14. **Defendant Mayor Daniel Horrigan** was, at all times relevant to the allegations in this Complaint, the Mayor of the City of Akron, acting within the scope of his employment and under the color of law. Defendant Horrigan was a supervisor of all City officers and agents whose conduct is at issue in this suit, and he is sued in his individual and official capacities. Defendant Horrigan has continued to serve as Mayor of the City of Akron and serves in that role as of the time of this Complaint's filing.

15. **Defendant Akron Police Chief Stephen L. Mylett** was, at all times relevant to the allegations in this Complaint, an employee of and the Chief of Police for the Akron Police Department, acting within the scope of his employment and under color of state law. Defendant Chief Mylett was at all relevant times the supervisor of all Akron Police Department employees and agents, including but not limited to all police officer Defendants whose conduct is at issue in this Complaint. Defendant Chief Mylett is sued in his individual and official capacities. Defendant Chief Mylett has continued to serve as the Chief of the Akron Police Department, and serves in that role as of the time of this Complaint's filing.

16. **Defendants Akron Police Officers Chief of Police Stephen Mylett; Deputy Chief of Police Jesse Leeser, Captain Michael Yohe, Captain Schwartz, Captain C. Brewer,**

7

**Captain Laughlin, Captain Rinn, Lt. Marks, Lt. R. Kuznik, Lt. Michael Miles, Lt. Garro, Lt. Kappler, Sgt. Black (#886), Sgt. Okoh, Sgt. Rinn, Sgt. Timothy Sinsley, Sgt. N.J. Milstead, Sgt. Vincent Tersigni, Akron Police Officer Badge #1918, Akron Police Officer Badge #1521, Akron Police Officer Badge #1247, Akron Police Officer Badge #1419, Akron Police Officer Badge #1128, Akron Police Officer Badge #1197, Akron Police Officer Badge #1310, Akron Police Officer Badge #1231, Akron Police Officer K. Brown (#1260), Akron Police Officer R. Daney (#1267), Akron Police Officer A. Brown (#1269), Akron Police Officer Smith (#1292), Akron Police Officer Shoemaker (#1505), Akron Police Officer Thompson (#1518), Akron Police Officer Domer (#1531), Akron Police Officer Taylor (#1532), Akron Police Officer L. Donohew (#1556), Akron Police Officer A. Brown, Akron Police Officer Brian Boss, Akron Police Officer Matthew Akers, Akron Police Officer Crawford, Detective J. Smith (#1336),** and **Detective Robert Vanek** were, at all times relevant to the allegations made in this Complaint, duly appointed officers or agents of the Akron Police Department acting within the scope of their employment and under color of Ohio law. They personally caused the harms to Plaintiffs and enforced the unlawful policies that are at issue in this Complaint. They are sued in their individual capacities.

17. **Defendants John Doe Akron Police Officers 1-50**, were, at all times relevant to the allegations made in this Complaint, duly appointed police officers employed by the Akron Police Department, acting within the scope of their employment and under the color of state law. They personally caused the harms to Plaintiffs and enforced the unlawful policies that are at issue in this Complaint. They are sued in their individual capacities.

18. **Defendants Akron University Police Officers Kabellar, Ullum, and Gillbride** were, at all times relevant to the allegations made in this Complaint, duly appointed police officers employed by the University of Akron, possessed authority under the laws of Ohio equivalent to any municipal police officer, were acting within the scope of their employment and under the color of state law, and upon information and belief were acting as mutual aid law enforcement at the best of the City of Akron and/or its officers. They personally caused the harms to some of the Plaintiffs and helped enforce the unlawful policies that are at issue in this Complaint. They are sued in their individual capacities.

19. **Defendant Summit County Sherriff's Deputy Andrew Bailing (#0992)** was, at all times relevant to the allegations made in this Complaint, a duly appointed law enforcement officer employed by Summit County, possessed authority under the laws of Ohio equivalent to any police officer, was acting within the scope of his employment and under the color of state law, and upon information and belief was acting as a mutual aid law enforcement at the best of the City of Akron and/or its officers. He personally caused the harms to some of the Plaintiffs and helped to enforce the unlawful policies that are at issue in this Complaint. He is sued in his individual capacity.

20. **Definitions.** For purposes of this Complaint, all individual law enforcement officer Defendants, whether presently identified by badge number, name, as John Does, or identified as extra-departmental law enforcement officers working at the City of Akron's behest, will be referred to collectively as the **Officer Defendants**. Officer Defendants who were in a supervising role during the at-issue events will be referred to together as the Supervising Officer Defendants but are also included in the term Officer Defendants.

**Supervising Officer Defendants** are all those Officer Defendants with a rank of Detective, Lieutenant, Sergeant, Major, Captain, Assistant Chief, or Chief. The terms Officer Defendants and Supervising Officer Defendants also include high-ranking officers including the Chief of Police when discussed in their individual capacities.

F<small>ACTS</small>

***Protests Begin in the City and the City Begins to Retaliate***

21. In the early morning hours on Monday, June 27, 2022, Akron Police attempted to pull over Jayland Walker for a minor traffic infraction. Mr. Walker fled, leading to a foot-chase that ended when eight officers opened fire on an unarmed Walker, barraging him with ninety-four rounds. Walker died on the scene, after forty-six of those bullets entered his face, his stomach, and his legs.

22. In the days following the killing of Jayland Walker, members of the Akron community gathered in the City's public spaces to peacefully protest the killing of Mr. Walker and to call attention to the police brutality in their community and across the county.

23. Peaceful protestors gathered in public parks, streets, and sidewalks, and around the Harold K. Stubbs Justice Center ("Justice Center"), where the Akron Police Department is headquartered, singing, rallying, chanting, and otherwise expressing dissent against the police and solidarity with the family and one another.

24. The peaceful protests and gatherings grew in scope on July 3, 2022, after police released body-cam footage of the officers shooting and killing Mr. Walker. Hundreds of peaceful demonstrators gathered at Quaker Station in downtown Akron at 2:30 p.m. for a Community Peace March organized by the Akron NAACP. Together, this group marched peacefully to City Hall, where state and city lawmakers were among those who called for

reform. Many of these protesters then continued to march and rallied near the Justice Center.

25. By 6:00 p.m., a group had convened in Grace Park. This group marched to Jayland's high school, John R. Bruchtel Community Learning Center, then to the home of Jayland's Grandmother to observe a moment of silence for Jayland.

26. Throughout the day, in response to the peaceful protests, Akron sent officers of the Akron Police Department throughout the community, decked in military-style body armor, along with SWAT vehicles and mutual aid officers, upon information and belief including University of Akron Police and Summit County sheriff's deputies, similarly outfitted with riot gear.

27. Along the streets outside of the Justice Center, officers parked large plow trucks in a position perpendicular to the sidewalk to obstruct the flow of traffic. The City and its officers similarly blocked traffic and sidewalks in other areas across downtown with physical barriers, cars, and police lines.

28. By 10:00 p.m., protesters had congregated once more at the Justice Center. There they continued to peacefully protest and chant, counting together from one to sixty—a reference to the then-estimate of the number of gunshot wounds in Jayland Walker's body.

29. At some point within the next hour, the Defendant Police Officers including John Doe Police Officers fired tear gas cannisters indiscriminately into the crowd. Their actions created chaos among the protesters, choked off voices calling for reform, and set many of those gathered to flight.

30. Officers continued to deploy gas and chemical irritant munitions in rapid succession, with additional barrages.

31. Upon information and belief, until this time, there was no lawful dispersal order issued, and no curfew or other order was in effect.

32. After 11:00 p.m., still not pursuant to any curfew or order, **Defendant Akron Police Captain Yohe** ordered his troops to tear gas the crowd once again.

33. The officers, including Officer Defendants, obliged, firing another round of chemical weapons into the group. Gas swallowed numerous protestors who posed no threat to safety and who were exercising their First Amendment rights.

34. The Officers undertook these applications of force pursuant either to express orders by Captain Yohe or pursuant to the Department's unwritten policy, custom, and plan of using force against peaceful demonstrators. These uses of force were indiscriminate, were not supported by any individualized probable cause, and were intended to suppress and/or deter protesters' expressive activity.

35. The tear gas deployed by the John Doe Akron Police Officers blinded numerous peaceful protesters and caused many to flee the billowing plumes. In the panic, many of those who had parked nearby attempted to leave downtown in their vehicles, but found their exit routes obstructed by the barricading snowplows. Some of these protestors were forced to drive on sidewalks to get around the massive, motionless vehicles and escape the clouds of chemical gas.

36. This additionally chaotic and hazardous environment was the foreseeable result of blocking major roadways with massive government vehicles, forcing protestors to gather

between these barricades, and then firing tear gas into the crowd for the purpose of dispersing it.

*The City Promulgates an Unlawful Emergency Order and Curfew*

37. While peaceful protests were ongoing, and in response to and retaliation against the same, the City and the Mayor were constructing a strategy of speech suppression including drafting an unlawful curfew order.

38. The City spread the word among law enforcement (but not the public) and in anticipation of the forthcoming curfew order, the Summit County Jail began to "set up for mass arrest" of protesters by the Akron Police.

39. At or around 11:46 p.m., **Defendant Mayor Daniel Horrigan** issued Executive Order #6-2022 (the "**Emergency Order**" or "curfew"), which declared a state of emergency in the City of Akron, and imposed a curfew from 9:00 p.m. to 6:00 a.m. punishable by a fine of $350 and up to 30 days in jail.

40. The massive geographical sweep of the Order purported to control all of downtown Akron between State Route 59 on the North and West sides, Interstate 76 and 77 on the South, and State Route 8 on the East. The roughly 2.5 square miles encompassed by the Emergency Order included much of the University of Akron campus, two major hospitals, and the City's Greyhound Bus Station.

41. The Emergency Order imposed sweeping restrictions in this area during curfew hours, prohibiting any person from being present in any "public space" for any reason between 9:00 p.m. and 6:00 a.m. The Order made no express exception for those present downtown for the purpose of engaging in constitutionally protected, peaceful speech and assembly.

42. The Order did, however, exempt certain other persons based upon their conduct and expression. This included people traveling between home and work, school, or worship; those seeking medical care; and those "fleeing dangerous circumstances," as well as law enforcement, fire and medical personnel, news media, and "other personnel authorized…or…otherwise exempt under the law."

43. The Emergency Order, by its terms, took effect at 11:59 p.m. on July 3, 2022, just thirteen minutes after it was announced. This meant that the Order became effective before any news outlets, press releases, or other postings had rendered its details or existence common knowledge to the members of the public likely to be subject to its strictures.

44. On information and belief, July 3 protesters, bystanders, or other community members had no actual or constructive notice of the Order at any time.

45. This Emergency Order took effect during the very curfew window it prescribed. Under the plain text of the Order, any non-exempt person who was present in a "public place" in downtown Akron on July 3 at 11:58 p.m. became a criminal the second the clock struck 11:59 p.m.  Given the order's eleventh-hour institution, this meant that at least some of the individuals in the 2.5 square miles of downtown covered by the order would be subject to arrest without any notice that their conduct had become proscribed.

46. Upon taking effect, the Order licensed and directed police officers and mutual aid officers, under Defendant Mayor Horrigan's "authority and supervision, to take all lawful actions as may be necessary to enforce the curfew restrictions."

47. By its plain terms, the Order's scope was vastly overbroad—criminalizing everything from a peaceful protestor engaging in protected expression to a private property owner

reading silently on a grassy lot adjacent to her house. Its restrictions thereby swept in and criminalized large swaths of protected and other non-criminal activity.

48. Further, the Emergency Order was so vague that Officers were effectively given absolute discretion to enforce it against anyone they saw. Persons of ordinary intelligence were left unsure whether activities ordinarily protected by the First Amendment qualified under the capacious exception for activities "authorized . . . or . . . otherwise exempt under the law."

49. In these and other ways, the Order was vague, overbroad, not narrowly tailored, failed to put people subject to it on sufficient notice of the prohibited conduct, was a prior restraint on speech, and was a content-based ban on disfavored expression.

50. In their execution of the Order, officers including Officer Defendants permitted some protestors opportunity to comply but not others, exacerbating the impossibility for those in downtown Akron to understand whether their words, actions, or presence would be deemed a criminal offense.

51. With this Emergency Order in place, the City, Mayor, and Akron Police Department in conjunction with mutual aid officers, set in motion a policy of and procedure for intimidating, trapping, arresting, detaining, and charging dozens of protestors at a time, without probable cause or personal knowledge of criminal conduct on the part of any individual arrestee.

### *Mass Arrests and Other Abuses Persist Under the Order*

52. Pursuant to the City's policy and practice of suppressing protests, police, including Officer Defendants, proceeded to separate and disperse groups of peaceful protesters using tear gas and pepper spray.

53. Officers including Officer Defendants tracked down and arrested pockets of protesters or any other individuals trapped downtown, deploying physical violence to subdue and detain arrestees who posed no evident threat.

54. Some of the victims of these mass arrests were detained in police vans, together with large numbers of other arrestees for extended periods of time. Up to 15 arrestees were detained in a single police van at a time without water, air-conditioning, or open windows. Upon information and belief, several arrestees lost consciousness from these claustrophobic and stifling conditions, while others experienced medical crises without prompt care.

55. The arrestees were then transported to and deposited *en masse* at booking stations, where Officers, including Officer Defendants, penned pro forma statements on Field Arrest Forms. These Forms listed the place of incident for nearly every arrestee as 217 S. High Street (the address of the Justice Center) regardless of where the protester in question was actually seized or whether the police had any factual basis to believe she had engaged in unlawful conduct at that location. Multiple Forms listed no time for the incident and none listed facts or allegations with particularity.

56. These Field Arrest Forms contained a "Narrative" section in which Officers should have set forth the facts that provided him with probable cause for the arrest. However, virtually every Form from these mass arrests contained the same two sentences with only minor variations between them: *e.g.,* "Δ took part in protest that turned to violent riot. Δ failed to disperse when ordered to." The few Forms that lacked the reference to the "violent riot" included similarly conclusory statements alleging the "Δ" violated curfew.

57. Though these factual statements were essentially identical from Form-to-Form, Officers including Officer Defendants charged people with seemingly random combinations of

disorderliness and curfew offenses like Riot, Disorderly Conduct, Failure to Disperse, Misconduct at Emergency, Incitement to Violence, or Adult Curfew. Nothing in the Forms provided any explanation for why the arresting or charging officers had charged any particular protester with the specific cocktail of crimes listed on their Form.

58. No Form or Complaint against any protestor contained any specific allegations to specific conduct that any Officer actually had knowledge of.

59. The arrested protestors were kept in holding cells for hour after hour, until they were finally processed by officers who lacked personal knowledge of their alleged conduct, arrest location, and/or time of offense. Only then, once they had been processed, were most transferred from the holding areas and given phone calls. On information and belief, in the cases of some Plaintiffs this took up to twenty hours or more.

60. Officer Defendants working in booking manufactured stacks of boilerplate Criminal Complaints based on the Field Arrest Forms. In lieu of facts, these Complaints offered only rote recitations of the elements of each offense, lifted verbatim from the Ohio Revised Code. These Complaints contained no information about the conduct of any of the arrestees, and each differed from the others only in the Defendant's name, her case number, and her arresting officers' badge number(s). They were rife with inaccuracies even as to this information.

61. The Complaints were so slapdash that the drafting officers often did not even bother to alter the generalized language of prohibition found in the statutes. Grammatically, many of these Complaints did not allege that Plaintiffs did *anything*—instead saying things like "[Officer] being duly sworn, says that [Plaintiff-Arrestee] at the City of Akron, Summit County, Ohio on the 4th Day of July, 2022 did No person shall participate with four or

more other with purpose to do an act with unlawful force or violence," or that a Plaintiff-Arrestee "did, Where five or more persons are participating in a course of disorderly conduct . . . a law enforcement officer . . . may order the participants . . . to disperse."

62. **Defendant Akron Police Sergeant Black (#886)** was the sole officer to sign and swear to nearly all the Complaints brought against Plaintiffs and others mass-arrested during July 3 and the early morning hours of July 4. He did so despite having no personal knowledge of whether there existed probable cause to substantiate the charges, nor whether *any* individualized facts existed to suggest that these arrestees had transgressed the Code provisions regurgitated in the Complaints.

63. Once booked and transferred from their holding cells, the protesters including Plaintiffs were jailed based on these copy-and-paste Complaints. Most remained in jail for at least another day until they were arraigned and finally released.

64. This procedure—in which Officers including the Officer Defendants (a) engaged in mass arrests of anyone they found, (b) transported them in bulk to holding cells and jails, (c) used agreed-upon language to fill out vague and often inaccurate Field Arrest Forms, and then (d) used those Forms to justify fact-free Criminal Complaints, days-long detentions, and months of harassment through the criminal legal system—constituted a clear, collaborative policy by the City and among law enforcement officials. This policy was designed to silence protestors, discourage their future speech, and intimidate other members of the community out of continuing to exercise their rights.

65. Just under fifty protesters were arrested, jailed, and charged in this protest-to-prison pipeline after the July 3 protests and between the hours of 12:00 a.m. and 4:00 a.m. on July 4, 2022.

66. Plaintiffs were among those subjected to these mass arrests and all of the policies and abuses against protestors described above.

67. Some Plaintiffs were additionally seized by the Officer Defendants' physical force, others subjected to chemical weapons. All were unconstitutionally detained, some for up to four days. During that time, some were denied medications, and others experienced other debilitating health issues and injuries. As a result of their causeless detentions and the resulting criminal processes, several lost their jobs.

68. As a result, Defendants subjected Plaintiffs along with other demonstrators to months-long criminal prosecutions of their protected expression, with *all* Plaintiffs' cases being dismissed either voluntarily or after a judge or jury's finding.

69. These Plaintiffs and their fellow demonstrators had their protected message quashed but heard the message of the City of Akron and its police loud and clear: "Protest at your peril."

### *Individual Plaintiffs Abused & Arrested After July 3*

### *Javonna Beasley*

70. **Plaintiff Javonna Beasley** is a 29-year-old Black woman, Akron resident, and the sister of Jayland Walker's fiancé. She joined the peaceful demonstrations on July 3, 2023 to protest the shooting of her brother-in-law by the Akron Police.

71. During the evening of July 3, Ms. Beasley peacefully demonstrated with a group at or near the Akron Municipal Court. Ms. Beasley engaged in no unlawful behavior, let alone violent or destructive conduct, and upon information and belief was not subject to a lawful dispersal order.

72. John Doe Akron Police Officers indiscriminately deployed tear gas against the assembled protestors including Ms. Beasley.

73. In the chaos that Defendants created, Ms. Beasley attempted to disperse and return home. But officers including the Officer Defendants were already engaging in mass arrest tactics.

74. Ms. Beasley was forced to take shelter from the tear gas behind a nearby building, fearing additional unlawful tactics by Officers of the same police force that had gunned down her brother days prior. She waited there for several hours, hoping for things to die down.

75. Eventually, as she was trying to leave, Ms. Beasley encountered several John Doe Akron Police Officers, who seized and arrested her near Exchange St. in downtown Akron.

76. Upon information and belief, no arresting officer saw or had personal knowledge of any particular conduct they alleged that she had engaged in.

77. Ms. Beasley was arrested by, among other Officer Defendants, **Defendant Akron Police Officer Thompson (#1518)** on charges of Riot, Failure to Disperse, and Misconduct at Emergency; on information and belief **Defendant Officers #1918 and 1521** were also involved in the unlawful arrest and mistreatment of Ms. Beasley.

78. The arresting Officer Defendants completed a "Field Arrest Form," documenting the allegations against Ms. Beasley which was nearly identical to dozens of other forms and Complaints they completed for mass arrestees that night. The Form averred that the arrest took place at "217 S. High," blocks from the actual arrest. The boilerplate Form language alleged conclusorily and incorrectly that Ms. Beasley "took part in protest that turned to violent riot" and "failed to disperse when ordered to." No specific allegations appear.

79. The Officer Defendants including John Doe Akron Police Officers hauled Ms. Beasley to a booking station, where **Defendant Akron Police Sgt. Black (#886)** signed a Criminal Complaint charging her, without probable cause or personal knowledge, with the crimes

listed on the Form. The section of the Complaint describing what Ms. Beasley "did" merely recited some of the elements of the alleged offenses. Like the Forms, the Complaints against Ms. Beasley and others were boilerplate batch papers, almost *all* executed by Sgt. Black, and which were rife with inaccuracies.

80. The Officer Defendants including John Doe Akron Police Officers then caused Ms. Beasley to be detained in a jail cell. While in her cell, and as a result of the force employed against her during the protests, the terror she experienced while hiding to avoid arrest by a police force that had killed her brother-in-law, her concern for her three young children, and the reality of her present incarceration for exercising her constitutional rights, she began to experience symptoms of a panic attack. She was discharged so that she could be transported by ambulance to a hospital for assessment.

81. After her release, the City of Akron, as part of its coordinated approach to continue punishing protest speech like Ms. Beasley's, subjected her to nearly six months of criminal prosecution.

82. After months of litigation including mandatory court appearances, Ms. Beasley's charges were dismissed on January 25, 2023.

83. In addition to the violation of her rights, trauma, physical injuries, and other damages she incurred, Ms. Beasley was required to miss work to appear in court, and absences led to termination of her employment by Tallmadge Finish Co.

### Jay Boden

84. **Plaintiff Jay Boden** is a twenty-six-year-old resident of Tallmadge who at the time of the protests worked as a manager at Pulp Juice and Smoothie Bar.

85. When he learned of the gatherings scheduled for July 3 Mr. Boden resolved to attend in support of the Walker family. Mr. Boden had never attended a protest before, but he

decided that he could not sit by after seeing something so unjust happen in his local community.

86. By the time Mr. Boden arrived, peaceful protesters had congregated at the Justice Center. Mr. Boden parked his car a fair distance from downtown, and walked to join the other protesters on High Street.

87. Mr. Boden engaged in the peaceful protests outside the Justice Center, asking his government for change.

88. Police, including the Officer Defendants, at the order of the Supervising Officer Defendants, and as part of the City and the Police Department's policy and plan, began to deploy chemical weapons against the crowd.

89. A **Defendant John Doe Akron Police Officer** deployed pepper spray directly against a woman right next to Mr. Boden. Mr. Boden and several other protesters were exposed to the gas as they helped to get the blinded woman out of the crowd and to a medic.

90. After rinsing out his eyes and rehydrating, Mr. Boden went up to Main Street, where others were gathered. Once there, he sat down to rest his burning eyes.

91. Again at Main Street, however, Officer Defendants including **John Doe Akron Police Officers** fired tear gas into the crowd at Mr. Boden and others who were still gathered peacefully and exercising their constitutional rights.

92. One of the gas cannisters landed near Mr. Boden, whose already burning eyes were blinded by the full effects of its plume.

93. Mr. Boden heard the officers fire another cannister as he choked, blinded, and tried to disperse.

94. Police used these chemical weapons indiscriminately, dangerously, and without justification as protesters attempted to disperse away from Main St. and the Justice Center.

95. Blinded and in pain, Mr. Boden became lost. Eventually, another protestor helped to flush his eyes and help him find his way back to Main St.

96. At the Justice Center, however, Officer Defendants had mobilized and deployed a military-style armored vehicle. Officer Defendants inside this vehicle fired more tear gas cannisters into the crowd, still indiscriminately and without justification or cause.

97. The Officers pressed the protestors, and Mr. Boden and others attempted to disperse to a safe place, and to comprehend what Officers were directing in order to comply. However, he could not remove himself safely because he was being repeatedly blinded. Instead, Mr. Boden did his best to keep out of the way.

98. As Mr. Boden departed down Main Street, he realized several Officer Defendants were tackling another protestor to his left, and Mr. Boden raised his hands and said he was there peacefully.

99. Two **John Doe Akron Police Officers** tackled him, slammed him to the ground with their shields, and cuffed him. The Officers' violent tactics left Mr. Boden with scars on his elbow and knee, and with broken glasses.

100. One of these John Doe Officers told Mr. Boden that he was being arrested for violating the curfew. According to his Field Arrest Form, Mr. Boden's alleged violation occurred at midnight, one (1) minute after the curfew took effect.

101. Mr. Boden's Field Arrest Form says that he was arrested by **Defendant Akron Police Officer A. Brown (#1269)** at 12:00 a.m. at "217 S. High"—the same location listed for most other protestors, though he was arrested at least a block away from there.

102. In the Field Arrest Form, Defendant Brown alleged the exact same unfounded allegations found in other protestors' Forms: that Mr. Boden was "involved in [a] violent riot" and "refused to leave after several warnings."

103. The Officer Defendants transported Mr. Boden to a police van and loaded him in, where he remained detained and watched other protestor-victims of the City's mass arrest and violent dispersal scheme begin to fill up the vehicle.

104. Mr. Boden saw one man, who appeared to have a broken or dislocated shoulder, drifted in and out of consciousness without receiving medical care.

105. Once the Officer Defendants filled the van with protestor-arrestees, they brought Mr. Boden and others to booking and detained him in a cell. Mr. Boden notified officers guarding the cell that he is diabetic and needed insulin, but he was not permitted to access it for at least another 20 hours, after the chaos of the mass arrest.

106. During that time, **Defendant Akron Police Sgt. Black (#886)** signed a Criminal Complaint charging Mr. Boden, without probable cause or personal knowledge, with the same allegations listed on the Form. The Complaint contained inaccurate and nonspecific recitations of the elements of some offenses, and nothing more.

107. After his release, the City prosecuted the baseless criminal charges against Mr. Boden for seven months until dismissing all charges on February 1, 2023.

108. Mr. Boden still bears the scars of the officers' assault on his knee and elbow, still experiences vision loss in his eye, and continues to suffer the violations of his rights, among other injuries.

### *Quinton Byrd*

109. **Plaintiff Quinton Byrd** is a thirty-year-old Black man and father of five. He resides in Akron with his family.

110. Mr. Byrd did not participate in the protests at issue here. During the July 3 protests, late at night, Mr. Byrd was walking through downtown to his friend's house.

111. Mr. Byrd had not been informed of and had no way to be on notice of the Mayor's Emergency Order or Curfew at that time.

112. Mr. Byrd steered clear of the crowds, choosing instead to cut through a parking garage near the corner of S. Broadway Street and E. Exchange Street.

113. On information and belief, as Mr. Byrd tried to exit the garage, he found the path blocked by an unmarked vehicle.

114. As Mr. Byrd exited, **Defendants John Doe Akron Police Officers** accosted him, repeatedly accusing him of participating in the protests. On this basis, they physically attacked Mr. Byrd and placed him under arrest.

115. The Officer Defendants' use of force left Mr. Byrd with a busted and scraped lip and a scraped knee.

116. Mr. Byrd's Field Arrest Form, copied from those used against those who *did* intend to gather for protest that night, alleged that Mr. Byrd had committed Riot, Disorderly Conduct, and Misconduct at Emergency. It contained the same allegations found in other Forms, stating simply, "Above involved in violent riot. Asked to leave and refused."

117. The Form was executed by **Defendant Summit County Sherriff's Deputy Andrew Bailing (#0992)**, as well as **Defendant Akron Police Sergeant Black (#886)** who had sworn to every batch Form and Complaint that night**.** On information and belief, Bailing was one of the officers who arrested and beat Mr. Byrd, and was working at the control of Akron and its Supervising Officers.

118. Defendant Sgt. Black then signed a Criminal Complaint charging Mr. Byrd, without probable cause or personal knowledge, with the same allegations listed on the Form, and without alleging anything more particular than a recital of the elements of some crimes.

119. The Officer Defendants transported Mr. Byrd to the Summit County Jail and held him all day July 4 and 5 until his July 6 arraignment and release.

120. Over the next six months, and as a result of the July 4 arrest, Mr. Byrd was subjected to a baseless criminal prosecution which required at least four court appearances. All charges were dismissed at the prosecution's request on January 5, 2023.

121. As a result of the arrest and prosecution Mr. Byrd struggled to find childcare for the four children who resided with him. Mr. Byrd was also stigmatized by the arrest, after hearing his name associated with the arrested protesters on the news. As a result of his July 4 arrest, Mr. Byrd was deemed to have violated his probation and jailed. During this period, he struggled again to secure extended childcare for his kids. These harms and the violation of his constitutional rights continue to damage him.

### *Davonte Clark*

122. **Plaintiff Davonte Clark** is a twenty-year-old Black man and resident of Akron.

123. Mr. Clark arrived in downtown Akron to join the other protesters at or around 9:50 p.m. on July 3, 2022. He parked his car in a parking lot across the street from Canal Park and joined the peaceful demonstrations.

124. At some point after Mr. Clark joined the protests, **Defendants John Doe Akron Police Officers** indiscriminately deployed tear gas or similar chemical weapons against the protesters.

125. Mr. Clark was exposed to these chemical weapons which affected his eyes, lungs, and skin.

126. At no point prior to the use of these chemical weapons did Mr. Clark hear a warning or dispersal order from the officers. On information and belief, no lawful dispersal order was made and any announcements made by police were so garbled or inconsistent as to render those announcements incomprehensible.

127. Mr. Clark tried to remove himself from the area, but his car was blocked in by police vehicles, and he and others were confused, disoriented, and in pain.

128. He was accosted by several **Defendant John Doe Akron Police Officers**. Mr. Clark obeyed the officers' commands after they identified themselves, but Defendant John Doe Officers nonetheless arrested Mr. Clark and two others.

129. Mr. Clark's Field Arrest Form, like others, cites the incorrect circumstances and location of his arrest, contains bare conclusory language, and lists the crimes of Riot, Failure to Disperse, and Misconduct at Emergency.

130. The Form for Mr. Clark was signed by **Defendant Akron Police Officer Thompson (#1518)** and indicates that **Defendant Officer #1187** ran a warrant check; on information and belief these Defendants were two of the arresting officers along with John Doe Officers.

131. **Defendant Akron Police Sgt. Black (#886)** then signed a Criminal Complaint that charged Mr. Clark, without probable cause or personal knowledge, with the crimes listed

on the Form. The Complaint and its deficiencies matched the other dozens that Black signed as part of the City's strategy.

132. Mr. Clark was taken to the Summit County Jail and held all day July 4 and part of the day July 5, 2022 until his arraignment and release. During this detention, Mr. Clark was forced to miss work and put in jeopardy of losing his job.

133. Over the next eight months, Mr. Clark was required to make between six and seven court appearances as the City prosecuted him on these unprovable charges. On March 24, 2023, as with most other mass arrestees, all charges were dismissed at the prosecutor's request.

### *Devonna Culver*

134. **Plaintiff Devonna Culver** is a twenty-two-year-old Black woman and resident of Youngstown.

135. In the early morning hours of July 4, 2022, Ms. Culver was in Akron with two of her friends to meet up with a cousin downtown. She was not intentionally involved in the protests, and she and her friends were dressed up for a night out.

136. Nevertheless, at or before 1:00 a.m. on July 4, 2022, a **Defendant John Doe Akron Police Officer** accosted Ms. Culver and her friends and told them to walk to a car to leave downtown. They complied. However, as they walked away, the **John Doe Officer** followed them.

137. Then, another **Defendant John Doe Akron Police Officer** drove up in a police cruiser and told several **other Defendant John Doe Akron Police Officers** present to arrest Ms. Culver and her friends.

138. These Officer Defendants then forcibly seized Ms. Culver and, on information and belief, told her that she was under arrest for violating the curfew.

139. John Doe Officers, by their use of physical force in arresting Ms. Culver, caused the front of Ms. Culver's dress to fall down, revealing her bare breasts to all present on the street.

140. The Officers did not permit Ms. Culver to fix her dress to cover herself, waiting instead until after she had been placed in handcuffs. Once her wrists had been restrained, a John Doe Akron Police Officer pulled up the front of Ms. Culver's dress.

141. Ms. Culver's Field Arrest Form, like other such Forms, lists the wrong location for her arrest and incorrect and bare allegations for the crimes of Riot, Disorderly Conduct, and Failure to Disperse.

142. The Form for Ms. Culver was signed by **Defendant Akron Police Officer O. Domer (#1531)** and indicates that **Defendant Akron Police Officer A. Brown (#1269)** ran a warrant check. The badge number of **Defendant Akron Police Sgt. Black (#886)** also appears on the signature line. On information and belief, these Officer Defendants were involved in the arrest.

143. As with the other protestors and bystanders swept into the mass arrest, Sgt. Black then signed a Criminal Complaint against Ms. Culver that listed himself and Defendant Officer Domer as complainants. He charged Ms. Culver, without probable cause or personal knowledge, and using incorrect and unspecific allegations, with the crimes listed on the Form.

144. Ms. Culver was taken to the Summit County Jail and held all day July 4 and part of the day July 5, until her arraignment and release.

145. On January 10, 2023, after six months of court appearances while the City continued to pursue the unfounded Complaint, all charges were dismissed at the prosecution's request.

146. **Plaintiff Janae Fort** is a thirty-two-year-old Black woman who lives in Akron with her ten-year-old daughter.

147. Ms. Fort joined the protests on July 3, 2022. She wanted to join her voice to those calling for change and reform.

148. Though Ms. Fort, like the other Plaintiffs, remained nonviolent throughout the protests, **Defendant John Doe Akron Police Officers** deployed tear gas and other chemical weapons into the group she had joined in an attempt to silence the protesters and separate them.

149. As Ms. Fort fled the clouds of stinging gas, trying to disperse, comply with confusing and inaudible commands, and get to safety, she fell in the chaos Defendants created and injured her knee.

150. A **Defendant John Doe Akron Police Officer** arrested her at or around 3:00 a.m. based upon her participation in the peaceful demonstrations.

151. Ms. Fort's Field Arrest Form lists the time of the incident as 3:02 a.m. on July 4, 2022, and the place as 217 S. High Street—several blocks from her arrest location. The Form is signed by **Defendant Akron Police Officer #1531**, on information and belief one of the Officer Defendants who caused her false arrest.

152. The Form alleged that Ms. Fort committed Misconduct at Emergency and Failure to Disperse and contained similar incorrect and conclusory allegations as on all such Forms.

153. Defendants booked and jailed Ms. Fort until she was released pending further proceedings on July 5, 2022.

154. After months of prosecution and multiple court appearances, the City dismissed all charges against Ms. Fort on March 13, 2023.

155. **Plaintiff Mykia Johnson** is a 24-year-old Black woman, mother of three, and resident of Akron. Her fiancé was the sister of Jayland Walker's fiancé.

156. Counting Mr. Walker among her family, Ms. Johnson participated in the peaceful protests from day one and continued to protest Jayland's killing in the days that followed.

157. Ms. Johnson joined those gathered on July 3, 2022, to make her voice heard through nonviolent, peaceful protest. She had taken to heart the words of Jayland Walker's mother celebrating the peaceful nature of the protests. Ms. Johnson wanted to honor those wishes.

158. Ms. Johnson protested peacefully throughout the day, then as the night became later and police violence erupted, she tried to go home. When she returned to her car downtown, however, it was blocked in by police, and John Doe Officer Defendants told her to come back for it later.

159. Ms. Johnson complied and waited downtown for roughly an hour, then returned to her car. However, when she got back there, a **Defendant John Doe Akron Police Officer** ordered her put her hands in the air. The Officer then informed her that she was under arrest for violating the curfew.

160. The John Doe Officer placed Ms. Johnson in handcuffs and took her to a police prisoner transport vehicle where he restrained her with zip ties along with the other protestors. Other John Doe Officers held her, booked her, then detained her overnight in the County Jail.

161. Ms. Johnson's Field Arrest Form lists **Defendant Akron Police Officer #1531** but was executed by **Defendant Officer Thompson (#1518)**; on information and belief these Officer Defendants were involved in her arrest as well as charging her.

162. In the Form, like the other such Forms, Thompson lists the incorrect arrest location, reiterates the same conclusory allegations found in the other forms, and charges her with Rioting, Failing to Disperse, and Misconduct at Emergency.

163. With this inaccurate and conclusory form as a basis, **Defendant Akron Police Sgt. Black (#886)** signed a Criminal Complaint charging Ms. Johnson, without probable cause or personal knowledge, and without sufficiently correct or specific allegations, with the crimes listed on the Form.

164. Ms. Johnson was finally booked and released late on July 5.

165. During criminal proceedings, prosecutors pushed Ms. Johnson to plead guilty and accept a thirty-day jail sentence by suggesting that they found video of Ms. Johnson engaging in violent and/or destructive conduct. Upon further study, the videos did not depict Ms. Johnson at all.

166. Ultimately, the City dismissed all charges against her.

167. In the nearly seven months between her release and the dismissal of her charges, Ms. Johnson was forced to make multiple court appearances, disrupting her life and requiring her to miss work to rebut the City's baseless claims.

### *Ayomide Manns*

168. **Plaintiff Ayomide Manns** is an eighteen-year-old student at the University of Akron, majoring in biomedical science with the goal of becoming a neuroscientist.

169. During the time relevant to this Complaint, Ms. Manns was a seventeen-year-old minor child. During that time Ms. Manns was visiting Akron to participate in a summer program for students interested in the fields of science, technology, engineering and mathematics (STEM). While in Akron for this program, she stayed in the residence hall located at 180 E. Exchange Street near the University ("the dorm").

170. During the day on July 3, 2022, Ms. Manns joined the peaceful demonstrations to protest the killing of Jayland Walker and call for change.

171. That evening, when **Defendants John Doe Akron Police Officers** deployed tear gas or other chemical weapons against the demonstrators as described above, young Ms. Manns was caught in the weapons fire. Her eyes and face began to sting and water violently, and she sought refuge inside a nearby building.

172. The Officer Defendants lacked individualized probable cause or any other justification for their uses of force, and on information and belief issued no lawful or audible dispersal order before unleashing their weapons.

173. Later in the evening, once she had partially recovered, Ms. Manns left to meet up with a friend at a late-night calzone restaurant several blocks from Ms. Manns' dorm. While trying to return home to her dorm, she realized the Officer Defendants and other officers had blockaded the route home.

174. Ms. Manns asked one **John Doe Akron Police Officer** how she was supposed to get home. The officer told her to "fucking figure it out."

175. Unable to get back, Ms. Manns and her friend remained downtown in an area away from the protests.

176. Ms. Manns and her friend remained in this spot until **Defendants John Doe Akron Police Officers** again began to deploy tear gas or similar chemical weapons at or near their location. Fleeing the gas again, Ms. Manns and her friend headed in the direction of the Akron Children's hospital.

177. Near the hospital, several more **Defendants John Doe Akron Police Officers** deployed tear gas or similar chemical weapons at Ms. Manns' and her friend.

178. At this point, Ms. Manns and her friend temporarily gave up on trying to get back to the dorm and tried to recover in a parking garage. There they waited for the police presence downtown to subside so they could safely return to the dorms.

179. As they exited the garage, Ms. Manns saw several **Defendants John Doe Akron Police Officers**. The pair approached these officers to ask how they could get back.

180. Officer Defendants responded by seizing Ms. Manns and her friend, slamming them to the ground, and placing them in handcuffs.

181. Ms. Manns was placed under arrest, though the Officers lacked a warrant or probable cause to believe that Ms. Manns was then committing any crime.

182. **Defendant Akron Police Officer O. Domer (#1531)** signed and swore to a delinquency Complaint against Ms. Manns in Summit C.P. case no. RF22-7-195; on information and belief **Officer #1419** was also involved in the arrest or charging. On information and belief, Domer was one of the Officer Defendants involved in the uses of force and false arrest of Ms. Manns. Officer Domer, accused Ms. Manns of Rioting, despite lacking probable cause to believe that she had engaged in conduct meeting the statutory definition. Like other protestor Complaints, this recited no particular facts or allegations making out arrestable behavior. **Defendant Akron Police Officer #1431** signed the Complaint and on information and belief participated in the arrest or use of force against Ms. Manns.

183. Officer Defendants took Ms. Manns to the police station, held her for about four hours, then dropped her off outside the home of the mother of a friend, where she had to wait outside for hours to catch an early morning bus.

184. On information and belief, the City later dropped the delinquency charges against Ms. Manns just as with the baseless adult prosecutions it maintained.

### *Damean Martin*

185. **Plaintiff Damean Martin** is a nineteen-year-old Black man, a direct support professional who works to support individuals with disabilities, a resident of Akron and a recent father. Mr. Martin had joined the protests on July 1, 2022, and continued until his unconstitutional arrest in the early morning hours of July 4.

186. July 3, as he had in the days prior, Mr. Martin joined in the peaceful protests through the Akron streets, demanding change and accountability for the death of Jayland Walker.

187. That evening, Mr. Martin began to witness frightening police behavior directed toward the protesters. He saw officers conduct mass arrests. He witnessed officers drive recklessly through the streets.

188. As a result, Martin attempted to move away from what was happening and leave, but **Defendant Officers,** including John Doe Officers and, on information and belief, **Officers #1231 and 1187,** accosted, seized, and arrested him.

189. **Defendant Akron Police Officer #1531** signed and swore to the contents of Mr. Martin's Field Arrest Form. Mr. Martin's Field Arrest Form was as inaccurate and vague as the other such Forms that night. It charged Mr. Martin with Rioting, Failure to Disperse, and Misconduct at Emergency. Its narrative section contained only the same, familiar conclusory sentences: "Δ took part in protest that turned into a violent riot. Δ failed to disperse when ordered."

190. From this Form, **Defendant Akron Police Sgt. Black (#886)** produced a Criminal Complaint charging Mr. Martin, without probable cause or personal knowledge, with those same crimes. The section of the Complaint purporting to describe what Mr.

Robinson "did" contained the same rote recitations of the Ohio Revised Code as all of Sgt. Black's other complaints.

191. Mr. Martin was jailed until July 5. After months of unfounded prosecution, the City dismissed all charges against him by September 14, 2022.

### *Caleb Mays*

192. **Plaintiff Caleb Mays** is a 30-year-old general contractor from Lorain, Ohio who was in Akron visiting his family during the weekend of the protests.

193. On July 3, 2022, he went downtown to the ongoing peaceful protests simply to watch and learn what was happening. After what he witnessed, however, he began to join in the protest speech and assembly and shared in expressing dissent.

194. Mr. Mays went down to Lock 4 downtown and began walking down the steps where he saw Akron Police arresting a small group of peaceful demonstrators.

195. Mr. Mays took out his phone to record the police misconduct and in response, additional police including **John Doe Officer Defendants** rushed him, attacked him, and arrested him.

196. During his arrest, on the of the **John Doe Officer Defendants** called him the N word. Upon information and belief, this occurred in the presence of other Officer Defendants and a Supervising Officer Defendant, and was captured on video.

197. The Officer Defendants who participated in Mr. Mays' arrest and the unlawful conduct against him included **Officer Neumann, Officer #1310, and Officer #886** and **John Doe Officers.**

198. After Defendants caused his arrest, which was retaliatory and without probable cause, police including the Officer Defendants charged him with failure to disperse and a curfew violation among other unsupported misdemeanors.

199. Upon information and belief, the arresting and charging Officer Defendants used the same unspecific, boilerplate allegations they used against the other people and other Plaintiffs they swept up in their mass arrest efforts that day.

200. The City of Akron and its agents then maintained criminal litigation against Mr. Mays for nearly a year, forcing him to attend multiple hearings and incur time and cost, for baseless charges.

201. Ultimately, by June 23, 2023, all charges against Mr. Mays were either dismissed, or he was determined to be not guilty.

*Natalia Robanhode-Wyrd*

202. **Plaintiff Natalia Robanhode-Wyrd** is a 23-year-old resident of Atwater, Ohio, a rural township outside of Akron. She works at the Reed Memorial Library in Ravenna.

203. Ms. Robanhode-Wyrd had been a part of the protests for Jayland Walker that sprang up across Akron in the days prior to July 3, 2022.

204. Ms. Robanhode-Wyrd joined the Akron protesters again on July 3, 2022, to call for accountability and reform from the Akron Police Department.

205. On the evening of July 3, Ms. Robanhode-Wyrd was among those protesting in front of the Justice Center in downtown Akron. She was in the group where Officer Defendants began to indiscriminately deploy tear gas against the assembled protesters who were exercising their fundamental constitutional rights of free speech and assembly in a nonviolent manner.

206. On multiple occasions one of several **Defendants John Doe Akron Police Officers** deployed tear gas or similar chemical weapons directly against or in the vicinity of Ms. Robanhode-Wyrd without lawful justification to use such force.

207. Ms. Robanhode-Wyrd tried to cover her own eyes and mouth from the spray and to provide relief to those who were blinded or in pain from the thick clouds by squirting saline solution into their eyes.

208. Later that evening, Ms. Robanhode-Wyrd sat down next to another protester who stood alone holding a sign in front of a line of **John Doe Akron Police Officers.** While she was sitting, the line of John Doe Officers rushed at Ms. Robanhode-Wyrd and the other protester.

209. At no point did Ms. Robanhode-Wyrd hear any order for her and the man with the sign to disperse; on information and belief no such lawful or audible order was made prior to the Officer Defendants using force at the City's and the Supervising Officer Defendants' orders.

210. **John Doe Akron Police Officers** then arrested Ms. Robanhode-Wyrd, despite lacking a warrant or probable cause to believe she had committed or was in the process of committing any crime for which she could be arrested.

211. **Defendant Akron Police Sergeant Black (#886)** signed a Criminal Complaint against Ms. Robanhode-Wyrd (whom it listed as "Natalia Robanhodewyr") charging her, without probable cause, personal knowledge, or any proffered factual basis, with Rioting, Failing to Disperse, and Misconduct at Emergency.

212. The Complaint listed **Defendant Akron Police Officer A. Brown (#1269)** as a co-complainant; on information and belief Brown was involved in the arrest and/or use of force against Ms. Robanhode-Wyrd.

213. After her arrest, Officer Defendants put Ms. Robanhode-Wyrd in the back of a police cruiser with other protestors, took her to a booking area and detained her for hours.

214. Ms. Robanhode-Wyrd was then transferred to the Summit County Jail until her July 6 arraignment and release.

215. By spring of 2023, all charges against her were dismissed at the prosecution's request.

*Brandon Robinson*

216. **Plaintiff Brandon Robinson** is a 24-year-old Black man who was not protesting, but who was swept up in the City's sweeping mass arrest effort anyway.

217. During the early morning hours of July 3, 2022, Mr. Robinson was waiting outside of the entrance of the Depot Apartments, near the intersection of E. Cedar Street and Broadway, waiting for his friend to let him up. No other people including protestors were present with him or near him as he waited.

218. Two John Doe Police Officer Defendants pulled up and exited their vehicle and began running toward Mr. Robinson at full tilt. Terrified, Mr. Robinson instinctively began to run away.

219. After realizing these were police, Mr. Robinson stopped running and spoke to one of the Officers. Mr. Robinson explained that he was just waiting to get into the apartments, and that he had begun to run in fear. Immediately, two additional **Defendant John Doe Akron Police Officers** arrested him and put him in a transport van.

220. Mr. Robinson's Field Arrest Form says that he was arrested by **Defendant Akron Police Officer #1531**, and was signed by **Defendant Officer Thompson (#1518)**; on information and belief these officers were involved in his unlawful arrest. The Form was part of the same batch as those used against protestors, and included similar incorrect information and bare allegations.

221. Although Mr. Robinson did not do what the Form alleged and was not involved in the protests, he was still arrested pursuant to the overbroad and unlawful curfew and as part of the City's mass arrest and suppression plan.

222. The Officer Defendants transported Mr. Robinson to the courthouse and placed him in a holding cell for a short time, then held him for hours in another transport van, then put him in the County Jail with restraints on his hands and feet.

223. The conditions in the van were stifling, claustrophobic, and suffocating. While trapped in this van, Mr. Robinson witnessed two arrestees pass out. Others, desperate for any breath of fresh air, banged on the vehicle doors.

224. As with those who were actually protesting, **Defendant Akron Police Sgt. Black (#886)** signed a boilerplate Criminal Complaint charging Mr. Robinson, without probable cause or personal knowledge, and inaccurately and conclusorily, with Rioting, Failing to Disperse, and Misconduct at Emergency.

225. Mr. Robinson was finally arraigned and released on July 5. He missed a family funeral during his detention, and while his family had mourned together, Mr. Robinson was trapped in a jail cell.

226. Notice of Mr. Robinson's arrest appeared in the "busted pages" of the local paper. He had never before been arrested or jailed and was incredibly embarrassed by such a public declaration of his newfound status as a presumed criminal.

227. The City prosecuted Mr. Robinson for more than ten months between his release and his trial, Mr. Robinson was forced to miss work on numerous occasions to fight these baseless charges in court.

228. Ultimately, by May 2023, Mr. Robinson was found not guilty of Riot and Failure to Disperse, and the charge of Misconduct at Emergency was dismissed.

### *Jack Rohrer*

229. **Plaintiff Jack Rohrer** is a 24-year-old restaurant server from Copley who attended the Justice for Jayland protests to show solidarity with the protestor message and the family and express dissent against police violence.

230. On the evening of July 3, Mr. Rohrer was standing on a sidewalk in downtown Akron peacefully protesting and engaged in protected expressive conduct.

231. While still on the sidewalk on South Main Street, Mr. Rohrer began videotaping and photographing the events at the protest using his personal device.

232. Akron police, including Officer Defendants and multiple **John Doe Officer Defendants,** violently and without warning rushed toward him, tackled him, beat and punched him.

233. On information and belief Defendants' actions were in retaliation against and for the purpose of silencing Mr. Rohrer's participation in the protests and his documenting of the scene through photo and video.

234. **Defendant Akron Police Officers #886** and #**1269** and **John Doe Officers** participated in this attack and subsequent arrest and charging of Mr. Rohrer.

235. In the same boilerplate batch fashion as others, Defendant Officers charged Mr. Rohrer with misdemeanor failure to disperse and disorderly conduct, took him to the Summit County Jail, booked him, and caused him to be detained for days.

236. During his unlawful detention, he was refused medical treatment for the cuts, scratches, and other injuries he incurred from the beating and excessively forceful arrest by Defendant Officers. Like others mass arrested and detained with him, his physical and

emotional injuries worsened while he was being kept away from participating in the protests in violation of his constitutional rights.

237. When Mr. Rohrer was finally released, officials dropped him far away from downtown, in a bowling alley parking lot.

238. After being forced to fight close to a year of baseless criminal proceedings, Mr. Rohrer was acquitted of all charges.

### *Brandon Wright*

239. **Plaintiff Brandon Wright** is a 30-year-old Black man and restaurant manager who lives in Akron.

240. On the evening of July 3, 2022, Mr. Wright left work and went to have some dinner with friends downtown. As he was attempting to leave the dinner restaurant and head home, Officer Defendants in a police cruiser sped toward him, running a red light, and arrested him, purportedly for a curfew violation.

241. **Defendants John Doe Akron Police Officers** seized him and placed him under arrest without probable cause, as part of their policy of arresting any potential protester or person they saw downtown during the curfew. Defendants took Mr. Wright to jail in a wagon with others, where they booked and detained him.

242. **Defendant Akron Police Sgt. Black (#886)** later signed a Criminal Complaint charging Mr. Wright, without probable cause or personal knowledge, with Riot, Failure to Disperse, and Disorderly Conduct. This was done in the same fashion as with the other mass arrestee protestors from that night even though Mr. Wright was not actually protesting.

243. The Complaint lists **Defendant Akron Police Officer Thompson (#1518)** who, on information and belief, along with John Doe Officer Defendants, participated in the unlawful arrest and charging of Mr. Wright.

244. After months of baseless criminal prosecution caused by the City and Officer Defendants, the City dismissed all charges against Mr. Wright on September 8, 2022.

### *July 4 Protests and Continuing Constitutional Violations*

245. During all of the July 3 and 4 arrests, no Plaintiff, whether protestor or bystander, committed or threatened any act of violence or destruction or committed any arrestable crime. No Plaintiff even failed to comply with a lawful or audible dispersal order. However, pursuant to the City's policy and plan, at the order of the Supervising Officer Defendants, and at the hands of the Officer Defendants, Plaintiffs and dozens of others were hurt, arrested, and detained to keep them off the streets.

246. Despite the City and Officer Defendants' efforts to silence protest speech, additional (though smaller) protests continued in downtown Akron through the afternoon and evening of July 4, 2022.

247. Police including Officer Defendants sat posted atop buildings and continued to barricade streets, in particular watching a peaceful group of about 75 protesters who gathered for a rally at the Justice Center.

248. During that afternoon, the Freedom Black Led Organizing Collaborative (Freedom BLOC), a group dedicated to increasing civic engagement and developing community leaders in the local Black community, organized a group that marched to the home of Mayor Daniel Horrigan. There they protested peacefully, demanding reform, before marching down the street where Freedom BLOC members gave a speech.

249. Though no incidents of violence were reported among the protesters during the late morning, afternoon, or evening of July 4, 2022, the City and Officer Defendants continued their policy of speech suppression and retaliation, harming and arresting multiple more individuals engaged in First Amendment activities including Plaintiffs.

250. The Mayor's unlawful Order remained in effect, and the Officer Defendants perpetuated their anti-protest policies in part pursuant to that unlawful Order.

251. By July 4, some demonstrators and community members had notice that some Order was in place, but the Order suffered from the same constitutional infirmities both facially and as applied to Plaintiffs.

### *Plaintiffs Abused & Arrested After July 4*
### *Jordan Mays & Harshita Ray*

252. **Plaintiff Jordan Mays** is a twenty-one-year-old chef and resident of Columbus, Ohio. Mays is an organizer with Justice, Unity, and Social Transformation (J.U.S.T.), a Columbus-based nonprofit organization dedicated to fostering solidarity and providing direct aid to those experiencing homelessness or economic hardship.

253. **Plaintiff Harshita Ray** is a twenty-one-year-old psychology student at the Ohio State University in Columbus, Ohio.

254. Ray and Mays drove together from Columbus to Akron to participate in the protests taking place on July 4, 2022. They parked near the University of Akron, then headed to join the assembled peaceful protestors. Ray and Mays remained with the peaceful protesters calling for change during the day.

255. Before 9:00 p.m., Ray and Mays tried to return to their car, walking away from the demonstration area on the sidewalks. Two University of Akron Police officers, **Defendants Officer Kevin Kabellar (#18/55)** and **Officer Christina Ullum,** began

following Ray and Mays in a police vehicle; on information and belief, these officers followed Ray and Mays from the protests.

256. Kabellar and Ullum pulled over and exited their cruiser to accost Ray and Mays, accusing them of criminal trespass in a parking garage. Officer Kabellar lunged at Mays and grabbed their arm. Kabellar and Ullum then forcibly subdued Mays and secured their wrists with handcuffs.

257. As these Officer Defendants arrested Mays, Ray pulled out their phone and began to film, surprised by the aggression and fearful of further misconduct on the part of the police. Ray began to walk slowly backward and ask the officers to stop the violence.

258. Though Ray posed no threat, Officer Kabellar advanced on them, grabbed their arm and twisted it behind their back, and pushed Ray to the ground, where Kabellar and Ullum used their body weight to press Ray into the concrete and zip-tie Ray's wrists.

259. When the Officers pulled Ray up, Ray realized that they could not walk because the use of force had injured their leg. Ray informed the officers that they were hurt and asked for medical attention. Kabellar and Ullum refused to render or call medical aid.

260. At this point, additional Defendant Officers arrived to assist Officers Kabellar and Ullum. With their help, Kabellar and Ullum separated Ray and Mays, throwing Ray headfirst into the backseat of a police vehicle and detaining Mays in a separate police vehicle.

261. Ray and Mays were detained in these vehicles for an hour, until the Officer Defendants issued them written warnings for criminal trespass and tickets charging them with disorderly conduct, banned Ray from the University campus, and let them leave.

262. After returning to the Columbus area, Ray saw physicians for their leg injuries caused by the arrest and assault, and one physician directed Ray to report the injury as an assault by a law enforcement officer.

263. In the months that followed both Mays and Ray had to shuttle back and forth from Columbus for more than ten court appearances to fight the criminal charges. Neither had regular access to a vehicle so they had to rely on favors and aid. Ray had to take day after day of unpaid leave from their job to attend court and to miss classes at school.

264. The City dismissed the charges against Mays on February 8, 2023. Mr. Ray was acquitted on all charges on March 23, 2023.

265. The Officer Defendants' aggressive tactics, use of force, retaliation, and abuse of authority as encouraged by the Order left an impression of Ray and Mays: neither was willing to attend subsequent protests in Akron for fear that they would again be assaulted and detained for engaging in protected expression.

### *Evan O'Reilly*

266. **Plaintiff Evan O'Reilly** is a twenty-nine-year-old community organizer from Cleveland.

267. Mr. O'Reilly drove down from Cleveland to join the those protesting in Akron on July 4, 2022. Around 1:00 p.m., Mr. O'Reilly was a part of a group gathered near the Mayor's house as a part of the demonstration organized by Freedom BLOC.

268. Mr. O'Reilly joined the demonstration to look out for the safety and organization of the other peaceful demonstrators. Mr. O'Reilly wore a bright, "high visibility" vest over his clothing to communicate this fact to protesters and police.

269. During the afternoon rally, two armored vehicles, driven by Officer Defendants, drove at the group in an attempt to disperse it. At that point, on information and belief, police had not properly issued a lawful dispersal order.

270. Several protesters, including Mr. O'Reilly, stood holding signs and expressing their message as they saw these vehicles bear down. Upon information and belief, if there was an order to disperse issued, there was no legitimate opportunity to comply.

271. During these events, Mr. O'Reilly was arrested by a **Defendant John Doe Akron Police Officer**, who zip-tied Mr. O'Reilly's wrists behind his back and put him in the back of a police vehicle.

272. Mr. O'Reilly's Field Arrest Form, similar to those used the prior night, charged Mr. O'Reilly with Disorderly Conduct using spare and incorrect batch allegations. The Form was signed by **Defendant Akron Police Officer #1267** who, on information and belief, participated in the arrest.

273. Defendant Officer #1267 also swore to and signed a Criminal Complaint against Mr. O'Reilly, also charging him with Disorderly Conduct. The Complaint regurgitates the elements of Akron City Code 132.01A1, the municipal ordinance version of the Disorderly Conduct offense.

274. Mr. O'Reilly was jailed for two days and released on July 6.

275. Mr. O'Reilly was forced to return to Akron on multiple occasions to appear in criminal court to defend the retaliatory and unfounded charges against him.

276. The City prosecuted Mr. O'Reilly for this offense for more than six months. Finally, the City dismissed the charges against Mr. O'Reilly on January 28, 2023.

### *Emily Terry*

277. **Plaintiff Emily Terry** is a twenty-nine-year-old biracial woman and childcare worker from Cleveland who participated in the protests on July 4.

278. During the afternoon of July 4, 2022, Ms. Terry joined the gathering organized by the Freedom BLOC, who had assembled to peacefully protest near the Mayor's home.

279. While peacefully protesting, Ms. Terry was seized and arrested by **Defendant John Doe Akron Police Officers**, upon information and belief including Officer R. Daney.

280. The Officer Defendants secured her wrists with zip-ties, which they fastened so tightly that her wrists became numb for an extended period.

281. They took Ms. Terry to the Summit County Jail. She was charged in a rote Criminal Complaint, similar to the other protestor Complaints discussed above. **Defendant Akron Police Officer #1267** signed the Complaint charging Ms. Terry with Disorderly Conduct; on information and belief that Officer was involved in causing her arrest also.

282. Ms. Terry was jailed overnight. She was denied basic medical care and necessary medication. She was not released for more than 20 hours.

283. Ms. Terry was forced to make repeated court appearances, including traveling to Akron to defend against the criminalization of her protest speech. Ultimately, the City dismissed the charges against her.

### *Continued Anti-Protest Policies and Actions through July 6-7*

284. As a result of the above-described suppression and misconduct by the City and Officer Defendants—and in part because many protestors were literally still jailed—protests dwindled and protestor speech was chilled.

285. However, smaller protests persisted as community members continued to speak out against Jayland's death.

286. Mayor Horrigan and the City of Akron briefly suspended the unlawful Order and did not officially reinstitute it in substantially similar form until late on July 6 (after which time it remained in force through July 11).

287. However, the curfew's terms, the manner in which it was promulgated, changed, and enforced, and its vagueness and overbreadth made it impossible to discern whether and during which times it was officially in place.

288. As a result, police continued to make arrests, use force, and engage in other unconstitutional speech suppression pursuant to the curfew even while it was purportedly suspended.

289. Protesters continued to make their voices heard in Akron during the day and into the evening of July 6, 2022.

290. Protestors continued to face the same unconstitutional police conduct under the curfew.

291. Still, as before, Plaintiffs caused no threat, violence, or actual damage to persons or property in the City.

*Plaintiffs Abused & Arrested After July 6*
*Nemet Alrawajfeh & Harrison Mills*

292. **Plaintiffs Nemet Alrawajfeh** and **Harrison Mills** came to downtown Akron in the early evening of July 6 and assembled with a small group of other peaceful demonstrators near the Justice Center.

293. Although neither Ms. Alrawajfeh nor Mr. Mills engaged in violent, threatening, or unlawful conduct at any time, the Officer Defendants deployed force to seize, arrest, and silence them both that day.

294. **Officer Defendants #1336, #1348, and/or John Doe Officers** sprayed pepper spray into her face to subdue, arrest, and remove her from the protest.

295. The Officers' arrest report specifically cites the content of Ms. Alrawajfeh's speech as part of the rationale for the arrest, describing her as "yelling profanities at Officers in public."

296. The application of chemical weapons to subdue a nonviolent protestor for being in a public street was excessive, disproportionate, unconstitutional to any risk Ms. Alrawajfeh posed to the public.

297. As part of the same peaceful group, Mr. Mills attempted to comply with orders he believed began to be given by Officer Defendants. However, **Defendants Akron Police Officers #1336, #1348, and/or John Doe Officers** physically seized Mr. Mills and attacked him.

298. Defendant Police Officers #1336, #1348, and/or John Doe Officers proceeded to attack and arrest both Mr. Mills and Ms. Alrawajfeh. Officer Defendants then took both of these Plaintiffs to a booking station, where booking officers drafted criminal Complaints, charging them with Riot, Disorderly Conduct, and Failure to Disperse, using similar boilerplate and vague allegations as those used on prior days.

299. Mr. Mills was released 18 hours later pending further proceedings. On January 5, 2023, after a lengthy prosecution, a jury found him not guilty of Riot or Disorderly Conduct, and a judge found him not guilty of Failure to Disperse.

300. Similarly, Ms. Alrawajfeh was released on July 7. After a months-long prosecution against her, the City dismissed all charges against Ms. Alrawajfeh on March 28, 2023.

### *Michael Harris and Jacob Blake Sr.*

301. Prior to the protests on July 6, 2022, Plaintiffs Jacob Blake Sr., Michael Harris, Bianca Austin, and Cortez Rice came to Akron to support the Walker family and to participate in the peaceful demonstrations against police violence.

302. These Plaintiffs are part of the organization Families United Against Police Brutality. Families United is an organization formed by family members of victims of police

violence. Families United seeks to offer support for other families experiencing similar loss or hardship.

303. Upon information and belief, at some point during the protests and prior to the unconstitutional actions they took against Blake, Harris, Austin, and Rice, Defendants learned who these people were and the organization they are a part of.

304. Upon information and belief, Defendants' unconstitutional acts against these four Plaintiffs were made in retaliation against Plaintiffs' membership and association in this organization and the specific message they came to express.

305. **Plaintiff Jacob Blake, Sr.** is a Black man and one of the founders of Families United. He is the father of Jacob Blake, Jr., a young man who was paralyzed from the waist down when police officers in Kenosha, Wisconsin, shot him four times in his back and three times in his side.

306. **Plaintiff Michael Harris** is a 38-year-old Black man and member of Families United. He came from North Carolina with Mr. Blake to provide support to Jayland Walker's family and to express solidarity with those demanding change.

307. In the early evening of July 6, a group of peaceful protesters had congregated on the street outside the Justice Center, as groups had on several days of the past week. Plaintiff Michael Harris was present in this group, waving a Pan-African flag.

308. Mr. Blake was nearby, in a van parked on the side of the street, where he was resting. Ms. Austin and Mr. Rice were in the vehicle with him.

309. At or around 9:25 p.m., **Defendant Akron Police Sgt. Tersigni (#1300)** used the PA system of his police cruiser to command the peaceful protesters to vacate the street and get on the sidewalk. Protestors, including Mr. Harris, moved to the sidewalks, although

the purported commands were inaudible and, upon information and belief, not lawful dispersal orders.

310. Mr. Harris, after dispersing to the sidewalk, approached the Officer Defendants who were standing in the middle of University Ave. and obstructing traffic, seeking to understand what the police intended and to make peace.

311. **Defendant Akron Police Sgt. Milstead (#1315)**, who was also part of the line of officers, reacted to Mr. Harris's speech by rushing toward him and aggressively pushing him back toward the sidewalk. Mr. Harris retreated and Sgt. Milstead chased him further. Sgt. Milstead lunged at Mr. Harris, using one hand to grab his wrist and the other to grab his protective face mask. Sgt. Tersigni and other Officer Defendants were close behind, and piled onto Mr. Harris in a group attack.

312. Together, Milstead and the other Officer Defendants pushed and shoved Mr. Harris's body toward a metal bike rack, trapped him, and threw him around, applying force to Mr. Harris's back to propel him toward the solid metal rack.

313. At that point, **Plaintiff Jacob Blake Sr.** stepped out of his nearby parked car and onto the sidewalk to make sure Mr. Harris was safe. Immediately, however, he was forcefully pushed aside by **Defendant Akron Police Officer Crawford**, who detached himself from Mr. Harris to attack Mr. Blake.

314. Sgt. Milstead threw Mr. Harris onto the hood of the van recently occupied by Mr. Blake.

315. While Mr. Harris was slammed against the hood, **Defendants Akron Police Officer Taylor (#1532)** and **Officer Donohew (#1556)** joined the assault.

316. **Defendant Akron Police Officer Shoemaker (#1505),** ran over to where the other Officers had forced Mr. Harris to bend over at the waist, seized both of his wrists, and

pinned his arms behind his back. Officer Shoemaker threw five rapid, uppercut-style punches at the bent-over Harris's face. Two to three of those punches made full-force contact with their target, splitting his lip and blacking his eye.

317. After the blows struck his face, Mr. Harris was forced onto the concrete sidewalk at Mr. Blake's feet. Officers began to use their hands, feet, and knees to press Mr. Harris's face, chest, hips, and groin into the concrete. Officer Shoemaker kneed the prone Mr. Harris in the face. Mr. Harris never resisted or threatened any officer.

318. While these officers were barraging Mr. Harris, **Defendant Officer Crawford** had grabbed hold of Mr. Blake's wrist and twisted his arm. Mr. Blake has medical issues with his shoulder, legs, and heart, and the twisting of his arm subjected him to serious pain.

319. Officer Crawford along with other **John Doe Akron Police Officers** grabbed Mr. and threw him against the hood of his own car as he shouted that he was hurt, disabled, and trying to comply. Eventually Mr. Blake sank down to the concrete with his back against the metal barrier.

320. In the course of the attack Officer Defendants hit and injured Mr. Blake sufficiently to cause him to have a seizure, urinate on himself, shake all over, and pass out. Eventually an ambulance took him away. His next memory was in the hospital.

321. On information and belief, in addition to the above-identified Officer Defendants, **Officer Defendants #1336, 1292**, and **1128** were involved in the arrests and misconduct against Mr. Harris and Mr. Blake.

322. Officers booked Mr. Harris into a cold, dark single cell where they left him, injured. John Doe Police Officer Defendants completed a criminal Complaint with the same

deficiencies as those described above, alleging that Mr. Harris committed Riot, Resisting Arrest, Disorderly Conduct, and Failure to Disperse.

323. Mr. Harris was held in Summit County Jail for the remainder of the night of July 6, and for the night of July 7. While in the jail, officers threatened to tase him if he stood up. He was arraigned and released on July 8. He had to return to Akron repeatedly to fight unconstitutional criminal charges for months.

324. On February 23, 2023, an Akron jury found Mr. Harris not guilty of Riot, Disorderly Conduct, and Resisting Arrest after a one-day trial, and a judge then found him not guilty of Failure to Disperse.

325. Jacob Blake Sr., who had been rendered unconscious during the police attack, was taken to Akron General for treatment. He was charged using a similarly deficient Complaint which, among other errors, referred to him as Mr. Jones. He was arraigned on July 12, 2022, and released on charges of Riot, Resisting Arrest, Failure to Disperse, and Disorderly Conduct.

326. On December 12, 2022, after months of criminal litigation, a judge dismissed the charges of Riot and Disorderly Conduct. Months later still, the Court found Mr. Blake not guilty of Failure to Disperse. The City finally dismissed the Resisting charge on May 15, 2023.

327. Mr. Blake and Mr. Harris were forced through nearly a year of criminal litigation including travel, missing work, incurring other costs, and reliving the trauma of their violent and unlawful arrests while the City pursued unprovable charges against them.

### *Bianca Austin & Cortez Rice*

328. **Plaintiffs Bianca Austin** and **Cortez Rice** are also members of the organization Families United who had, along with Plaintiffs Michael Harris and Jacob Blake Sr., come

to Akron to support the grieving family of Jayland Walker and the protests calling for change.

329. **Plaintiff Bianca Austin** is a 42-year-old Black woman from Louisville, and the aunt to Breonna Taylor, a 26-year-old emergency room technician who was shot to death in 2020 while lying in bed by white Louisville police officers serving a "no-knock" warrant.

330. **Plaintiff Cortez Rice** is a 33-year-old Black activist and also a member of Families United who has been harmed by police violence.

331. Ms. Austin and Mr. Rice were present for the July 6, 2022 peaceful protests and gatherings described above.

332. Later that evening, after the attacks against and arrests of Mr. Harris and Mr. Blake, Ms. Austin and Mr. Rice drove to the Jail to try and post bond for Mr. Harris. Ms. Austin and Mr. Rice parked their van in the jail parking lot and waited for news about their friend.

333. In the early morning hours of July 7 multiple John Doe Akron Police Officers approached Ms. Austin and Mr. Rice and informed them that they were not permitted to be in the Jail parking lot.

334. The curfew and Order was not in place at that time, and even had it been, the Jail parking lot was outside of the areas it controlled. However, the Order was so vague and overbroad, and so invited arbitrary enforcement, that the Officer Defendants continued to enforce it anyway.

335. Mr. Rice and Ms. Austin attempted to leave the Jail anyway, but Defendant John Doe Akron Police Officers told them that they were being detained.

336. When Mr. Rice asked the officers what he and Ms. Austin were being charged with, one John Doe Officer responded, "We'll tell you later." Upon information and belief, one or

more Officer Defendants recognized Mr. Rice and Ms. Austin as protestors, and directed other Officer Defendants to arrest them in retaliation for their prior expression and their association with Justice for Jayland and Families United.

337. Officer Defendants removed Ms. Austin and Mr. Rice from their van, handcuffed them, and arrested them. During the detention, one John Doe Officer told Plaintiffs, "You really messed up by coming to our City."

338. On information and belief the Officer Defendants involved in the arrest and misconduct against Ms. Austin and Mr. Rice included **Officers Boss, Akers,** and **#1197** among others.

339. Defendants jailed these Plaintiffs for hours before they were charged or booked. Both Mr. Rice and Ms. Austin were charged with Riot, Disorderly Conduct, and Failure to Disperse in boilerplate criminal Complaints unsupported by sworn affidavits of probable cause, rife with vagueness and inaccuracy.

340. As with Mr. Harris and Mr. Blake, the City subjected Ms. Austin and Mr. Rice to months of frivolous criminal litigation, during which they were forced to miss work and leave family to drive from Louisville to attend Court.

341. Predictably, over the course of this litigation, a judge dismissed Ms. Austin's Riot charge because the Complaint was insufficient, and ultimately dismissed all remaining charges by March 9, 2023.

342. On May 8, 2023, on the eve of trial and after he had driven from Louisville to Akron for another court date, the prosecutor dismissed all charges against Mr. Rice. The City did not possess, and at no time did or could have possessed, evidence in support of the allegations against him.

343. As a result of the uses of force, speech suppression and retaliation, targeting, and unlawful arrest, detention, and prosecution against them, Plaintiffs Mr. Harris, Mr. Blake, Mr. Rice, and Ms. Austin suffered and continued to suffer concrete economic loss and serious trauma, pain, and suffering. These injuries constituted the City's welcome to peaceful impacted families who traveled to Akron in support of a grieving family.

### *Ongoing Ratification, Policies, and Similar Conduct by the City of Akron*

344. The above-described conduct by the Officer Defendants was done pursuant to the facially unlawful Emergency Order the City promulgated and its related policies, practices, and later ratification of the speech suppression that flowed from the Order. These policies and ratification were the moving forces behind the legal violations here.

345. Further, the enforcement and ratification of these policies by the Supervising Officer Defendants caused and exacerbated the harms incurred by Plaintiffs and other protestors. These Supervising Officer Defendants were responsible for ordering the uses of force and unlawful arrests and detentions at issue here. They each participated in formulating and executing action plans to carry out the City's unlawful policies of speech suppression. This included Supervising Officer Defendants meeting together in advance of the protests, coordinating and planning the City's speech suppression efforts, and on information and belief constructing action plans and directing their officers to execute these. This also included Supervising Officer Defendants watching and approving officer misconduct throughout the City on drone video and by other means, in real time, as well as giving orders on scene. Supervising Officer Defendants later doubled down on the harms they caused by approving officer uses of force, reviewing and signing off on reports of the misconduct, and testifying during frivolous criminal proceedings in support of their own unconstitutional conduct.

346. These policies, practices, supervision, and ratification of protest suppression continue to persist in the City of Akron against Justice for Jayland protestors even a year later. Each time that peaceful uprisings related to the killing of Jayland Walker have arisen, the City and Officer Defendants have deployed these same tactics against them. The City is already embroiled in civil litigation seeking to stop its unlawful speech suppression, and itself continues to criminally prosecute people for the exercise of their First Amendment rights.

347. Plaintiffs here were each subjected to these policies and practices by the City, Officer Defendants, and Supervisor Defendants, and seek from this Court some measure of justice to redress the damages they have suffered.

### FIRST CLAIM FOR RELIEF:
### 42 U.S.C. § 1983 – First Amendment
### *Against all Officer Defendants*

348. Plaintiffs incorporate by reference each of the foregoing paragraphs as if fully restated herein.

349. Peaceful protesting, speech, expression, assembly, and petition are fundamental constitutional activities protected by the First Amendment to the United States Constitution.

350. In the manner described more fully above, Defendants, acting individually, jointly, and in conspiracy with each other, engaged in a concerted effort to use force against, arrest, detain, and cause to be criminally charged and prosecuted Plaintiffs whom they encountered in downtown Akron during the period of protests in July 2022 on the basis that those Plaintiffs were engaging in First Amendment activities.

351. In the manner described more fully above, Defendants, acting individually, jointly, and in conspiracy with each other, used physical violence and chemical weapons against Plaintiffs for engaging in, or being suspected of engaging in, protected First Amendment activities and to break up peaceful protests.

352. The City's and the Mayor's Emergency Order and Curfew, which Officer Defendants, individually and together, enforced against Plaintiffs, was unlawful on its face and as applied, and Defendants used it to silence and retaliate against those protesting and to suppress and chill their future engagement in First Amendment activities.

353. The actions and policies of Defendants listed in this Claim for Relief and described more fully above were motivated by Defendants' responses to Plaintiffs' exercises of their First

Amendment rights to protest, peaceably assemble, speak out, and petition their government.

354. Defendants' policies and actions punished Plaintiffs for engaging in the constitutionally protected activities of protest, assembly, petition, and speech.

355. Defendants' policies and actions constituted retaliation against Plaintiffs for their exercise of fundamental First Amendment rights.

356. Defendants' policies and actions would chill a person of ordinary firmness from engaging in the constitutionally protected activities of peaceful protest and assembly.

357. As a direct and proximate result of the unconstitutional actions and policies of Defendants, Plaintiffs' First Amendment rights were violated and Plaintiffs suffered serious personal injuries entitling them to relief under the United States Constitution and 42 U.S.C. § 1983, including, but not limited to, physical injury, financial damages and adverse employment consequences for attending court proceedings, emotional trauma and distress, loss of reputation, loss of liberty, and other damages set forth in this Complaint.

358. Defendants' unconstitutional actions and policy of retaliation against protesters—which at least in part is ongoing still—has caused and will continue to cause irreparable harm to Plaintiffs and the community at large, chilling and inhibiting people from engaging in constitutionally protected First Amendment activities.

359. In the course of this conduct Defendants acted under color of law and within the scope of their employment.

360. Defendants are jointly and severally liable for this conduct.

**42 U.S.C. § 1983 – Fourth & Fourteenth Amendments: Excessive Use of Force**
*Against all Officer Defendants*

361. Plaintiffs incorporate by reference each of the foregoing paragraphs as if fully restated herein.

362. In the manner described more fully above, Defendants, acting individually, jointly, and in conspiracy with one another, violated the rights of Plaintiffs under the Fourth Amendment to the United States Constitution to be free from excessive force and thereby caused the injuries alleged above.

363. Defendants violated the constitutional rights of Plaintiffs to be free from the excessive and arbitrary use of force.

364. Defendants, in the manner described more fully above, employed physical violence, weapons, and chemical weapons to subdue and arrest Plaintiffs without lawful justification and to retaliate against them for the exercise of their constitutional rights.

365. Plaintiffs were thereby subjected to excessive force in violation of their Fourth and Fourteenth Amendment rights.

366. Defendants acted objectively unreasonably and with deliberate indifference to the rights and safety of Plaintiffs and their conduct was conscious-shocking.

367. Defendants also failed to prevent this misconduct by one another in spite of having the duty and opportunity and means to intervene to protect Plaintiffs.

368. As a direct and proximate result of the unconstitutional actions and policies of Defendants and their officers and agents, Plaintiffs' rights were violated, and Plaintiffs suffered serious personal injuries entitling them to relief under the United States Constitution and 42 U.S.C. § 1983, including but not limited to injuries and damages as described above, including, but not limited to, physical injury, financial damages and

adverse employment consequences for attending court proceedings, emotional trauma and distress, loss of reputation, loss of liberty, and other damages set forth in this Complaint.

369. In the course of this conduct Defendants acted under color of law and within the scope of their employment.

370. Defendants are jointly and severally liable for this conduct.

### THIRD CLAIM FOR RELIEF:
### 42 U.S.C. § 1983 – Fourteenth Amendment: Due Process
### *Against all Officer Defendants*

371. Plaintiffs incorporate by reference each of the foregoing paragraphs as if fully restated herein.

372. In the manner described more fully above, Defendants and their officers and agents deprived Plaintiffs of their liberty without due process of law when they, with deliberate indifference to Plaintiffs' rights, enforced and subjected Plaintiffs to vague, overbroad, and arbitrary curfew order which did not provide sufficient notice for ordinary persons to understand the conduct it purported to ban and which itself was unlawful; arrested Plaintiffs without probable cause for engaging in non-criminal conduct including protected First Amendment expression; and charged and caused the detention and prosecution of Plaintiffs for constitutionally protected or other non-criminal behavior.

373. In the manner described more fully above, Plaintiffs were deprived of their liberty without due process of law when they, after being arrested without probable cause, were detained by Defendants at length without a hearing, a warrant, or even access to a phone. This conduct was deliberately indifferent to Plaintiffs' rights and shocks the conscience.

374. In the manner described more fully above, Defendants and their officers and agents deprived Plaintiffs of their liberty without due process of law when they affirmatively

and indiscriminately used violence and chemical weapons against Plaintiffs without lawful justification. This conduct showed a deliberate indifference to Plaintiffs' rights, shocks the conscience, and violated the decencies of civilized conduct.

375. In the manner described more fully above, Defendants and their officers and agents deprived Plaintiffs of their liberty without due process of law when they, without probable cause or personal knowledge, signed and swore to criminal Complaints charging Plaintiffs with numerous crimes for which there was no basis let alone probable cause. When Defendants did this, they knew or should have known that they lacked the probable cause or personal knowledge to swear to these Complaints. Such conduct is repugnant to fundamental notions of fair play and substantial justice, shocks the conscience, and shows, at minimum, a deliberate indifference to Plaintiffs' rights.

376. In the manner described more fully above, Defendants and their officers and agents deprived Plaintiffs of their liberty without due process of law when they signed, swore to, and filed Criminal Complaints that they knew or should have known to be legally insufficient. Such conduct undermines the integrity of the legal process, shocks the conscience, and shows, at minimum, a deliberate indifference to Plaintiffs' rights.

377. As a direct and proximate result of Defendants' fundamentally flawed and unfair conduct and proceedings, Plaintiffs were deprived of their liberty without due process of law and suffered harms including, but not limited to, physical injury, loss of liberty, emotional trauma and distress, loss of reputation, legal fees, and other damages as set forth in this Complaint.

378. In the course of this conduct Defendants acted under color of law and within the scope of their employment.

379. Defendants are jointly and severally liable for this conduct.

**FOURTH CLAIM FOR RELIEF:**
**42 U.S.C. § 1983 – Fourth & Fourteenth Amendments: False Arrest & Imprisonment**
***Against all Officer Defendants***

380. Plaintiffs incorporate by reference each of the foregoing paragraphs as if fully restated herein.

381. As described more fully above, Defendants, acting individually, jointly, and in conspiracy with each other, caused Plaintiffs to be unreasonably seized, detained, imprisoned, and deprived of their liberty without probable cause to believe that Plaintiffs had committed a crime, in violation of their rights secured by the Fourth and Fourteenth Amendments to the United States Constitution.

382. Defendants further failed to prevent this misconduct by one another in spite of having the duty and opportunity and means to intervene to protect Plaintiffs from the same.

383. Defendants, exercising their power and authority as law enforcement officers and under color of law, intentionally and unlawfully arrested Plaintiffs without lawful privilege, without Plaintiffs' consent, and without probable cause to believe they were committing a crime.

384. Plaintiffs were imprisoned pursuant to these unprivileged arrests for a period of hours before the institution of legal proceedings. Throughout this period, the City and its officers and those working at their behest had no legal basis for detention, and are therefore liable for the damage caused by this detention.

385. As a direct and proximate result of their unlawful arrests at the hands of Defendants, Plaintiffs suffered and continue to suffer injuries and damages as described above, including, but not limited to, physical injury, financial damages and adverse employment

consequences for attending court proceedings, emotional trauma and distress, loss of

reputation, loss of liberty, and other damages set forth in this Complaint.

386. In the course of this conduct Defendants acted under color of law and within the scope of

their employment.

387. Defendants are jointly and severally liable for this conduct.

### FIFTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Fourth & Fourteenth Amendments: Malicious Prosecution
### *Against all Officer Defendants*

388. Plaintiffs incorporate by reference each of the foregoing paragraphs as if fully restated

herein.

389. In the manner described more fully above, Defendants, acting individually, jointly, and

in conspiracy with each other, instigated, influenced, or participated in the decision to

initiate criminal proceedings against and to prosecute Plaintiffs, knowing they lacked

probable cause for such prosecutions.

390. All criminal prosecutions against Plaintiffs were terminated in favor of Plaintiffs when

the cases against them were dismissed, or when a jury determined that they were not

guilty of the charges.

391. Defendants accused Plaintiffs of criminal activity, knowing those accusations to be

without genuine probable cause.

392. Defendants made statements to prosecutors with the intent of exerting influence to

institute and continue judicial proceedings against Plaintiffs.

393. Defendants, acting individually, jointly, and in conspiracy with each other, deliberately

engaged in arbitrary and conscience-shocking conduct that contravened fundamental

canons of decency and fairness and violated Plaintiffs' substantive due process rights and

in violation of the Fourteenth and Fourth Amendments to the United States Constitution.

394. As a direct and proximate cause of this malicious prosecution, Plaintiffs suffered and continue to suffer injuries and damages as described above, including, but not limited to, physical injury, financial damages and adverse employment consequences for attending court proceedings, emotional trauma and distress, loss of reputation, loss of liberty, and other damages set forth in this Complaint.

395. In the course of this conduct Defendants acted under color of law and within the scope of their employment.

396. Defendants are jointly and severally liable for this conduct.

### SIXTH CLAIM FOR RELIEF
**42 U.S.C. § 1983 – First, Fourth, & Fourteenth Amendments: *Monell* Claim**
***Against the City of Akron and Mayor Daniel Horrigan and Chief Stephen Mylett***

397. Plaintiffs incorporate by reference each of the foregoing paragraphs as if fully restated herein.

398. The incidents of misconduct, abuse, and disregard for Plaintiffs' constitutional rights described above were not isolated incidents or acts committed by rogue individuals. They were the product of a concerted strategy and policy of mass arrest, intimidation, use of force, detention, prosecution, and harassment, and of a culture of enforcement and acquiescence to unconstitutional police conduct.

399. Defendant City of Akron, at all times relevant herein, ratified, approved, authorized, and acquiesced in the unlawful and unconstitutional conduct of its respective officers and agents and consequently is directly liable for the acts of those agents, pursuant to 42 U.S.C. § 1983.

400. The actions of the Officer Defendants, as alleged above, were taken pursuant to one or more interrelated policies (even if some of those policies were never memorialized in

official, written edicts), practices, or customs of civil rights violations and unconstitutional practices of the City of Akron. These included, *inter alia*:

a. the enactment and ratification of an unconstitutional Emergency Order and Curfew which was unconstitutional on its face and as applied, which was vague, overbroad, and a content-based and not narrowly tailored speech restriction, and which was intended to be and was enforced against peaceful protesters without due process of law or providing adequate notice of purportedly regulated conduct;

b. the implementation of unconstitutional practices, customs, and policies—written or unwritten or official or unofficial—under and in addition to that curfew, related to police engaging in intimidation and retaliation, excessive uses of force, false arrest, unreasonable seizures, and malicious prosecutions; and

c. the failure to properly hire, train, supervise, discipline, transfer, monitor, investigate, counsel and/or otherwise control their police officers who engage in uses of excessive force, false arrest and detention, unreasonable seizures, and malicious prosecutions.

401. These policies, practices, and customs increased the risks that protesters exercising their constitutional rights—or any person who happened to be unlucky enough to be in Akron from July 3 to 7, 2022—would suffer physical injury, false imprisonment, malicious prosecution, and other constitutional violations and harms.

402. In the manner described more fully above, Defendant Mayor Horrigan, acting as final policymaker for and endorsed by the City of Akron, issued an Emergency Order imposing a Curfew on anyone in the downtown Akron area. This curfew was unconstitutional on its face and as applied because, among other things, (a) it was void *ab initio*; (b) it was overbroad; (c) it was unconstitutionally vague and allowed for arbitrary enforcement; (d) it constituted retaliation for protected First Amendment conduct, (e) it worked a prior restraint on protestors' speech; (f) it violated Plaintiffs' fundamental rights to assemble, associate, and protest under the First Amendment; and (g) it empowered officers to deprive individuals of their Liberty without Due Process of Law.

403. The Curfew and Emergency Order promulgated by the Mayor and endorsed by the City and enforced as part of its plan were also unconstitutional as applied to Plaintiffs. The Emergency Order and Curfew purported to criminalize these Plaintiffs' presence downtown without proper notice that such behavior was a crime. In the manner described more fully above, the Order took effect thirteen minutes after it was announced and *immediately* thereupon rendered these Plaintiffs' presence criminal. Plaintiffs thereafter we subject to arrest, violence, and chemical weapons for conduct made criminal via only verbal announcement with only thirteen minutes notice at most and without any opportunity to disperse.

404. This enforcement of the Curfew and Emergency Order was part of a larger unwritten City and/or Department policy, practice, or custom of encouraging APD officers to intimidate protesters by means of mass arrests, summary charges, and punitive pretrial detention. This policy was designed to discourage, suppress, and punish the exercise of Plaintiffs' First Amendment rights to assemble, to speak, and to petition the government.

405. In the manner described more fully above, the City of Akron and its Police Department engaged in a comprehensive and universal pattern of signing and swearing to plainly deficient Criminal Complaints against Plaintiffs without even a semblance of disclosed probable cause. This conduct served to suppress and punish protesters in a manner so widespread as to evince a clear, unwritten policy within the department of ratifying otherwise baseless executive detentions to keep protesters in jail cells.

406. In addition, officers of the Akron Police Department, an arm of the City, indiscriminately employed violence and chemical weapons to discourage and punish

Plaintiffs' speech—especially that speech expressing viewpoints which the City found undesirable or embarrassing and especially speech critical of police misconduct.

407. This pattern and practice—of employing excessive force without individualized cause in response to constitutionally protected activity—was the product of the Akron Police Department's policy, practice, and custom and is still ongoing today.

408. Moreover, the conduct of Defendant City of Akron and its officers and agents further demonstrates the City's custom of tolerance of or acquiescence to civil rights violations and unconstitutional police practices.

409. The policies, practices, and customs of the Defendant City and its Police Department were the moving force behind the misconduct described in this Count and behind the violations of Plaintiff's rights. This strategic plan and approach constituted a policy in the Akron Police Department, its elements were and still remain part of APD's culture, and the same were and still are allowed to exist because municipal policymakers with authority over the practices exhibited deliberate indifference to the problems, effectively ratifying them.

410. That the unconstitutional actions of the Defendants as alleged in this Complaint were part and parcel of a widespread City policies, practices, and customs is further established by the involvement in, and ratification of, these acts by supervisors and other officials and officers of the City and the Akron Police Department more fully described below.

411. The City of Akron, at all times relevant to the allegations, was deliberately indifferent to, approved, authorized, and acquiesced in the unlawful and unconstitutional conduct of its respective employees and/or agents and consequently is directly liable for the acts of those agents, pursuant to 42 U.S.C. § 1983.

412. As a direct and proximate result of the unconstitutional policies, practices, customs, or regulations set in motion, ratified, and willfully condoned by Defendants City of Akron and Mayor Horrigan and the Police Chief, Plaintiffs' rights were violated, and Plaintiffs suffered serious personal injuries entitling them to relief under the United States Constitution and 42 U.S.C. § 1983.

413. In the course of this conduct Defendants acted under color of law and within the scope of their employment and are persons within the meaning of 42 U.S.C. § 1983.

414. Defendants are jointly and severally liable for this conduct.

### SEVENTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – First, Fourth, & Fourteenth Amendments: Supervisory Liability
### *Against the Supervising Officer Defendants*

415. Plaintiffs incorporate by reference each of the foregoing paragraphs as if fully restated herein.

416. The constitutional injuries complained of here were proximately caused by (i) the intentional misconduct of the supervisory defendants, or (ii) by these supervisory defendants being deliberately and recklessly indifferent to their subordinates' misconduct, knowing that ignoring that misconduct would necessarily violate Plaintiffs' constitutional rights.

417. Specifically, the Supervising Officer Defendants ordered, facilitated, condoned, and oversaw the unconstitutional conduct of other Officer Defendants.

418. As a direct and proximate result of the actions of these Defendants, Plaintiffs' constitutional rights were violated, and they suffered injuries and damages as set forth above, including, but not limited to, physical pain and suffering, loss of liberty, emotional trauma and distress, adverse employment consequences, and other injuries and damages as set forth above.

419. In the course of this conduct Defendants acted under color of law and within the scope of their employment.

420. Defendants are jointly and severally liable for this conduct.

**EIGHTH CLAIM FOR RELIEF**
**State Law Claim for Assault & Battery**
***Against all Officer Defendants***

421. Plaintiffs incorporate by reference each of the foregoing paragraphs as if fully restated herein.

422. The actions of Defendant towards Plaintiffs created in them the apprehension of an imminent, harmful, and offensive touching, and constituted a harmful touching, made knowingly and without legal justification.

423. Defendants accomplished this harmful, non-consensual touching by means of manual touch, by touching with weapons and other objects, by touching of the eyes and sense organs by chemical weapons, and by various other means, instruments, and methods described more fully above. Defendants directly and proximately cause this touching.

424. The actions of Defendants thereby constituted assault and battery against Plaintiffs.

425. As a direct and proximate result of this conduct by Defendants, Plaintiffs suffered and continue to suffer injuries and damages as described above, including, but not limited to, physical injury, financial damages and adverse employment consequences for attending court proceedings, emotional trauma and distress, loss of reputation, loss of liberty, and other damages set forth in this Complaint.

426. In the course of this conduct Defendants acted under color of law and within the scope of their employment.

427. Defendants are jointly and severally liable for this conduct.

### NINTH CLAIM FOR RELIEF
### State Law Claim for False Arrest
### *Against all Officer Defendants*

428. Plaintiffs incorporate by reference each of the foregoing paragraphs as if fully restated herein.

429. Defendants, without lawful privilege, without consent, and without probable cause, detained and caused the arrest of Plaintiffs in violation of the laws of the State of Ohio.

430. Defendants were the direct and proximate cause of the illegal arrest, detention, imprisonment, and institution of legal proceedings against Plaintiffs.

431. The actions of Defendants, therefore, constituted false arrest and false imprisonment under Ohio Law.

432. As a direct and proximate result of their false arrests, Plaintiffs suffered and continue to suffer injuries and damages as described above, including, but not limited to, physical injury, financial damages and adverse employment consequences for attending court proceedings, emotional trauma and distress, loss of reputation, loss of liberty, and other damages set forth in this Complaint.

433. In the course of this conduct Defendants acted under color of law and within the scope of their employment.

434. Defendants are jointly and severally liable for this conduct.

### TENTH CLAIM FOR RELIEF
### State Law Claim for Malicious Prosecution
### *Against all Officer Defendants*

435. Plaintiffs incorporate by reference each of the foregoing paragraphs as if fully restated herein.

436. In the manner described more fully above, Defendants, acting maliciously, individually, jointly, and in conspiracy with each other, instituted, participated in, or continued the prosecution of Plaintiffs without probable cause.

437. As a consequence of the criminal prosecution, Plaintiffs were unlawfully seized and deprived of their liberty.

438. Plaintiffs' criminal prosecutions were terminated in their favor when the cases against them were dismissed, or a jury determined them not guilty.

439. The actions of Defendants therefore constituted malicious prosecution in violation of Ohio law.

440. As a direct and proximate result of this malicious prosecution, Plaintiffs suffered and continue to suffer injuries and damages as described above, including, but not limited to, physical injury, financial damages and adverse employment consequences for attending court proceedings, emotional trauma and distress, loss of reputation, loss of liberty, and other damages set forth in this Complaint.

441. In the course of this conduct Defendants acted under color of law and within the scope of their employment.

442. Defendants are jointly and severally liable for this conduct.

### ELEVENTH CLAIM FOR RELIEF
### State Law Claim for Abuse of Process
### *Against all Officer Defendants*

443. Plaintiffs incorporate by reference each of the foregoing paragraphs as if fully restated herein.

444. In the manner described more fully above, Defendants instituted a legal proceeding in an attempt to accomplish an ulterior purpose for which it was not designed. That proceeding was perverted to accomplish such purpose.

445. By causing the unlawful prosecution of Plaintiffs, even if some of the charges underlying the prosecutions *were* supported by probable cause, Defendants caused such prosecutions to be instituted and maintained for the unlawful purpose of suppressing First Amendment speech and punishing protest.

446. Direct damage resulted from this wrongful use of process: as a consequence of the criminal prosecutions, Plaintiffs were unlawfully seized and deprived of their liberty and made to suffer through months of public, time and const consuming litigation.

447. The actions of Defendants therefore, in the alternative to the extent they did not constitute malicious prosecution under state law, constituted abuse of process.

448. As a direct and proximate result of this abuse of process, Plaintiffs suffered and continue to suffer injuries and damages as described above, including, but not limited to, physical injury, financial damages and adverse employment consequences for attending court proceedings, emotional trauma and distress, loss of reputation, loss of liberty, and other damages set forth in this Complaint.

449. In the course of this conduct Defendants acted under color of law and within the scope of their employment.

450. Defendants are jointly and severally liable for this conduct.

**TWELFTH CLAIM FOR RELIEF**
**State Law Claim for Breach of Duty**
*Against all Officer Defendants*

451. Plaintiffs incorporate by reference each of the foregoing paragraphs as if fully restated herein.

452. During the events at issue here, Defendants had a duty to the public at large, including to Plaintiffs, to exercise due care and to act in a lawful and reasonable manner and to not act

in a negligent, grossly negligent, willful, wanton, reckless, intentional, and malicious manner.

453. Additionally, as law enforcement officers, Defendants had a duty to protect community members, including Plaintiffs.

454. Defendants breached those duties, failed to exercise due care, and acted with a malicious purpose and/or in bad faith and/or in a willful and/or wanton and/or reckless manner.

455. Defendants engaged in negligent conduct and at all times acted recklessly and/or willfully and/or wantonly such that they are not entitled to the immunities set forth in O.R.C. § 2744.01 *et seq.*

456. Defendants breached their duty when, among the other conduct described in this Complaint, they ordered and/or executed the use of force against unarmed, nonviolent protesters and did nothing to stop the same conduct by other officers against Plaintiffs, causing injury.

457. As a direct and proximate result of this breach of duty, Plaintiffs suffered and continue to suffer injuries and damages as described above, including, but not limited to, physical injury, financial damages and adverse employment consequences for attending court proceedings, emotional trauma and distress, loss of reputation, loss of liberty, and other damages set forth in this Complaint.

458. In the course of this conduct Defendants acted under color of law and within the scope of their employment.

459. Defendants are jointly and severally liable for this conduct.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand that judgement be entered in their favor on all counts and pray the Court award the following relief:

A.      Compensatory damages in an amount exceeding the jurisdictional amount in controversy requirement, to be determined at trial, for the violation of Plaintiffs' rights;

B.      Punitive damages in an amount to be determined at trial for the Defendants' willful, wanton, malicious, and reckless conduct;

C.      Declaratory and injunctive relief against the City of Akron enjoining its unlawful policies, practices, and customs and ordering the institution of policies, procedures, and training for the Akron Police Department to bring them into compliance with constitutional standards;

D.      Attorneys' fees and the costs of this action pursuant to law; and

E.      All other relief which this Honorable Court deems equitable and just.

***TRIAL BY JURY ON ALL CLAIMS FOR RELIEF DEMANDED.***

*/s/ Elizabeth Bonham*
Sarah Gelsomino (0084340)
Marcus Sidoti (0077476)
Elizabeth Bonham (0093733)
Friedman, Gilbert + Gerhardstein
50 Public Square, Suite 1900
Cleveland, OH 44113-2205
T: 216-241-1430
F: 216-621-0427
sarah@FGGfirm.com
marcus@FGGfirm.com
elizabeth@FGGfirm.com

*Counsel for Plaintiffs*

Dated June 29, 2023